**COMMONWEALTH of Pennsylvania,**
**Appellee,**

**v.**

**Maurice BARNES, Appellant.**

Superior Court of Pennsylvania.

Argued Oct. 27, 2004.

Filed Feb. 22, 2005.

Reargument Denied May 6, 2005.

**814**

Thomas J. Nolan, Scranton, for appellant.

Eugene M. Talerico, Asst. Dist. Atty., Scranton, for Com., appellee.

BEFORE: STEVENS, McCAFFERY and TAMILIA, JJ.

OPINION BY TAMILIA, J.:

¶ 1 Maurice Barnes appeals from the October 24, 2003, judgment of sentence of an aggregate 23 years and 3 months to 47 years imprisonment imposed after a jury convicted him of criminal conspiracy to commit murder in the third degree,[1] criminal conspiracy to commit robbery,[2] accomplice to robbery,[3] accomplice to delivery of a controlled substance (cocaine),[4] and criminal conspiracy to deliver a controlled sub-

---

**1.**  18 Pa.C.S.A. § 903.

**2.**  *Id.*

**3.**  *Id.,* § 306.

**4.**  *Id.*

stance (cocaine).[5] The convictions arise from a January 2002 drug transaction and fatal shooting of the victim by appellant's co-defendant, Robert Goodine.

¶ 2 On Thursday, January 24, 2002, appellant (a.k.a. Mo), and three acquaintances from New York, L.D. (a.k.a. L.B.), Kruger (a.k.a. Tame Harper), and co-defendant Robert Goodine (a.k.a. Twin), drove from New York City to Scranton, Pennsylvania to sell drugs, which they had all chipped in to purchase in New York. N.T., Trial, 6/10/03, at 191. Appellant, who had met Goodine approximately four days prior, had contacts in Scranton and organized the trip. *Id.* The men had at least two guns among them. *Id.*, at 257–261. Kruger had a .25 caliber pistol and Goodine had a .38 caliber handgun. At one point during the trip, appellant was observed with a gun in his waistband. N.T., 6/9/03, at 95–96.

¶ 3 While in Scranton, the men spent most of their time between the homes of Juanita Sue Ryan and Linda Lasher. Appellant knew Ryan since he had had a previous intimate relationship with Ryan's daughter, Dorothy Settles. N.T., 6/6/03, at 153–154. Ryan lived in the Midtown Apartments. N.T., 6/10/03, at 193–194. Lasher was a friend of Settles. N.T., 6/6/03, at 153–154.

¶ 4 By Friday evening, the men still had not sold any drugs, N.T., 6/10/03, at 195–199. While at Midtown Apartments that evening, they met Ron Sanders, an admitted crack cocaine addict. *Id.*, at 199; N.T., 6/5/03, at 40. Sanders offered that the men could sell drugs from his apartment. N.T., 6/10/03, at 200. Sanders took Kruger and Goodine to his apartment but while there, they overheard a phone message from someone demanding money from Sanders, so they left. *Id.* Later

that evening while all four men were at Lasher's home, Goodine began to complain that they had come to Scranton to make money but had not made any sales yet. *Id.*, at 201–202. So, the four men returned to Midtown apartments and began searching for people to whom they could sell drugs. *Id.*, at 203–204.

¶ 5 Appellant and L.D. encountered Sanders, who again offered that the men could sell from his apartment. N.T. 6/5/03, at 32. L.D. began selling from Sanders' apartment. N.T., 6/10/03, at 204–205. At one point, L.D. told Sanders that if they gave him drugs and he screwed up, presumably by smoking it himself, they would "get him," and they were not scared of the police. N.T., 6/5/03, at 36, 120. Meanwhile, appellant, Kruger, and Goodine sold drugs from the parking lot until approximately 3:00–4:00 a.m. N.T., 6/10/03, at 204. All four men made sales that night. *Id.*, at 204–205.

¶ 6 On Saturday morning, L.D. went to Sanders' apartment and gave him five $50 bags of cocaine, four to sell and one for Sanders' personal use. N.T., 6/5/03, at 37. Sanders smoked all five bags but told L.D. he had flushed it all down the toilet because the police had come. *Id.*, at 39, 41. At one point that afternoon, appellant went to Sanders' apartment and asked for the money from the sales of the cocaine, but Sanders said he didn't have it and appellant left. *Id.*, at 41, 135.

¶ 7 Sometime thereafter, Valerie Kizer arrived at Sanders' apartment looking to buy a $20 bag of cocaine. Sanders called L.D. telling him he needed a $20 bag to sell, and asked if he could work off the $200 he owed by selling more drugs. *Id.*, at 42–43. Kruger and L.D. went to Sanders' apartment with a $20 bag of cocaine, which they sold to Sanders. *Id.*, at 44.

5. *Id.*, § 903.

Goodine and appellant remained at Lasher's home. N.T., 6/10/03, at 210.

¶ 8 Charles Grant then went to Sanders' apartment looking for an "8–ball," i.e., 3½ grams of cocaine, the equivalent of six $50 bags, packaged in one whole chunk. Id., at 211. Kruger did not have enough cocaine so he called Lasher's house and asked Goodine to bring an 8–ball to Sanders' apartment. Id., at 210. Kruger left Sanders' apartment as Goodine and appellant arrived. Id., at 213. Appellant, L.D. and Kizer remained in the living room while Goodine and Grant went into the bedroom. Id. Goodine offered to sell Grant eight $50 bags of cocaine for $150. Id., at 214. Goodine testified that Grant had two one-hundred dollar bills and gave him one of the bills and insisted on getting change for that before he gave him the second bill. Id. Goodine went into the living room seeking change. Id. Grant emerged from the bedroom and began to complain about the quantity/quality of the cocaine. Id., at 215. While Grant was bent down, looking at the cocaine in his hands, Goodine shot him in the head. Id., at 217; N.T., 6/5/03, at 58; N.T., 6/9/03, at 151. L.D. ran from the apartment immediately after the shot was fired. N.T., 6/5/03, at 58.

¶ 9 Sanders and Kizer witnessed the shooting. Although Goodine testified the shooting was in self-defense, Grant made no threats and there is no evidence Grant had a weapon in his possession. N.T., 6/9/03, at 152; N.T., 6/10/03, at 166–167. Kizer testified that immediately after shooting, Goodine told appellant to "get the money." N.T., 6/9/03, at 153. Sanders and Kizer testified that both appellant and Goodine rummaged through Grant's pockets and his person before they ran out the door. Id.; N.T., 6/5/03, at 60. Shortly thereafter, appellant returned and searched Grant's body again before fleeing. N.T., 6/9/03, at 156–157; N.T., 6/5/03, at 63. Kizer testified that appellant took the rest of the cocaine from Grant's hands. N.T., 6/9/03, at 157.

¶ 10 Goodine himself testified that Grant had $200 on him when he came to the apartment. N.T., 6/10/03 at 214. Kizer testified Grant told her he had just gotten paid and she estimated he had between $400–500. N.T., 6/9/03, at 141. Carl Graziano, the prosecuting officer, estimated Grant had at least $200 on him at the time. N.T., 6/10/03, at 134. Goodine also admitted to picking up five of the eight bags of cocaine before leaving the apartment. N.T., 6/10/03, at 219. Police found only one dollar and some papers on Grant's body. N.T., 6/10/03, at 135. Kizer and Sanders testified that they took nothing from the body. N.T., 6/5/03, at 74; N.T., 6/9/03, at 183.

¶ 11 After the shooting, the men returned to New York City. N.T., 6/10/03, at 219. At some point, Goodine disposed of the gun he used to shoot Grant. Id., at 262–263.

¶ 12 During trial, as evidence of appellant's state of mind leading up to the trip to Scranton, the Commonwealth introduced some letters appellant had written in the fall of 2001, while he was incarcerated in New York on other convictions, to his then girlfriend, Amber Spencer, who was incarcerated in Lackawanna County. Those excerpts provide:

> We're both short. We seeing the town real soon and it's going to be sick. We some getting money ass niggers. I'm kinda of thinking how I might just pick my gun back up and go hard for about two months. Taking everything that's not nailed down. You feel me. Like that gun store.

N.T., Trial, 6/9/03, at 36; see also, Record # 15, Exhibit 1, 9/24/01 Letter. Spencer testified appellant meant he was coming to

Scranton to sell drugs and he would "take whatever he wants." N.T., 6/9/03, at 37. In the next letter admitted into evidence appellant wrote:

> And I know some mad old school D-boys who'll cut or do whatever we need done ma... I ain't going to front. I always wanted to get my hands into that side of the game... we just got to do it right. Like I say if we fuck through other niggas. We can't be getting our hands dirty anymore... Our job is to get the clientele up and get other people to do it for us... We got to do everything thought out.

N.T., Trial, 6/9/03, at 39–41; *see also,* Record # 15 Exhibit 3, 10/6/01 Letter. Spencer testified appellant meant he knew some men from whom he could get drugs and that he would not be the one selling, that he would get others to do it for him. N.T., Trial, 6/9/03, 40–41. In the next letter admitted, appellant wrote:

> This dope game is calling me. I know I can really do me, since I get started. The way I'm a go at it, all I need is two months in every town we come up on... I don't give a fuck. I'll sell it to my mother for that money.

N.T., 6/9/03, at 43–44; *see also,* Record # 15, Exhibit 4, 11/3/01 Letter. Spencer testified appellant meant he would sell drugs to get money and that he would do whatever he had to do. N.T., 6/9/03, at 43–44. In a letter appellant wrote just a few days before the trip to Scranton, appellant wrote:

> But like I said I'm on the way up ... there. I got some coke so I'm a put some money on your books.

N.T., 6/9/03, at 46; *see also,* Record # 15, Exhibit 5, 1/21/02 Letter. Spencer testified that in this letter appellant meant that he would put money on Spencer's Lackawanna County Prison account. N.T., 6/9/03, at 46.

¶ 13 Appellant continued to write to Spencer after he was arrested on these charges. The Commonwealth introduced two of these letters. In one, appellant asked Spencer to make sure Kizer did not come to court to testify and if she did, to change her testimony. N.T., 6/9/03, at 48. Spencer complied with this request. N.T., 6/5/03, at 162–163. In a February 21, 2003 letter, appellant asked Spencer to dissuade Settles from testifying against him. N.T., 6/9/03, at 50–52. Spencer complied with this request as well. *Id.*

¶ 14 Before trial, the Commonwealth filed a notice of intention to try appellant with Goodine; they also filed a notice of intent to seek the death penalty against appellant. Appellant filed an omnibus pretrial motion raising, *inter alia,* habeas corpus and suppression issues. After a hearing, the trial court denied the motion. Following trial on the merits, appellant was sentenced as indicated above. He filed a post-sentence motion which was denied. This timely appeal followed in which appellant raises the following issues:

A. Whether the trial court erred in denying Barnes' pretrial motion and, in so ruling, allowing the Commonwealth to introduce into evidence excerpts from certain letters written by Barnes to Amber Spencer?

B. Whether the evidence presented at trial, even when viewed in the light most favorable to the Commonwealth as the verdict winner, was sufficient to support Barnes' conviction for criminal conspiracy to commit third degree murder as charged under count II of the criminal information?

C. Whether the evidence presented at trial, even when viewed in the light most favorable to the Common-

wealth as the verdict winner, was sufficient to support Barnes' convictions for criminal conspiracy and/or liability as an accomplice to commit robbery as charged under counts VII and VIII of the criminal information?

D. Whether the trial court properly instructed the jury pertaining to Barnes' role as a co-conspirator and/or count II of the information charging conspiracy to commit third degree murder?

E. Whether the trial court erred in denying Barnes' request for a jury instruction on the lesser included offense of theft?

Appellant's brief at 6.

¶ 15 Appellant first argues the court erred in admitting excerpts of the letters he wrote to Spencer. The trial court concluded the letters were probative as to the Commonwealth's assertion that appellant orchestrated the trip to Scranton and engaged in drug activity, and it found the letters were admissible under the state of mind exception to the hearsay rule to show appellant's "intent and/or motive to commit a related act." Trial Court Opinion, Mazzoni, J., 5/1/03, at 28.

¶ 16 Appellant concedes the letters "clearly pertain to his purported involvement in a drug-trafficking conspiracy," but claims they have no other relevance as to appellant's state of mind concerning the events of January 26, 2002. Appellant's brief at 13. He contends the court should have excluded the letters because the danger of unfair prejudice outweighed the their probative value. *See* Pa.R.E. 403.

The admission of evidence is a matter vested within the sound discretion of the trial court, and such a decision shall be reversed only upon a showing that the trial court abused its discretion. In determining whether · evidence should be admitted, the trial court must weigh the relevance and probative value of the evidence against the prejudicial impact of that evidence. Evidence is relevant if it logically tends to establish a material fact in the case or tends to support a reasonable inference regarding a material fact. Although a court may find that evidence is relevant, the court may nevertheless conclude that such evidence is inadmissible on account of its prejudicial impact.

*Commonwealth v. Reid,* 571 Pa. 1, 34, 811 A.2d 530, 550 (2002) *writ denied,* 540 U.S. 850, 124 S.Ct. 131, 157 L.Ed.2d 92 (2003), (citations omitted).

¶ 17 We agree this evidence is hearsay and we conclude the trial court correctly found these letters were relevant to at least two of the crimes with which appellant was charged, i.e., accomplice to delivery of a controlled substance, and criminal conspiracy to deliver a controlled substance. *See* Pa.R.E. 801; *see also Commonwealth v. Begley,* 566 Pa. 239, 269, 780 A.2d 605, 623 (2001) (stating that hearsay is an out-of-court statement offered to prove the truth of the matter asserted in the statement). Although the trial court admitted the letters under the state of mind exception to the hearsay rule, Pa. R.E. 803(3), we agree with the Commonwealth that the letters were admissible as admissions by a party opponent. *See* Pa. R.E. 803(25); *see also Commonwealth v. Laich,* 566 Pa. 19, 26, 777 A.2d 1057, 1061 (2001) (stating that a defendant's out-of-court statements fall within the party admission exception to the hearsay rule). Although the trial court did not admit the evidence pursuant to this exception, we can affirm the trial court's decision on this basis. *See* Trial Court Opinion, Mazzoni, J., 5/1/2003, at 25–29; *see also Commonwealth v. Davis,* 816 A.2d 1129, 1136 n. 4 (Pa.Super.2003), *appeal denied,* 576 Pa.

710, 839 A.2d 351 (2003), (stating an appellate court may affirm on a basis different from that of the trial court).

¶ 18 We also find no abuse of discretion in the court's failure to conclude that the probative value of the evidence was outweighed by the danger of unfair prejudice. The comment to Pa.R.E. 403 defines "unfair prejudice" as "a tendency to suggest decision on an improper basis or to divert the jury's attention away from its duty of weighing the evidence impartially." Pa.R.E. 403, comment. As stated above, the admission of evidence is committed to the sound discretion of the trial court and we will only reverse where there has been an abuse of that discretion. *Reid, supra.* "An abuse of discretion is not merely an error of judgment, but is rather the overriding or misapplication of the law, or the exercise of judgment that is manifestly unreasonable, or the result of bias, prejudice, ill-will or partiality, as shown by the evidence or the record." *Commonwealth v. Cameron,* 780 A.2d 688, 692 (Pa.Super.2001). We simply find no basis upon which to conclude that there was a danger of unfair prejudice that outweighed the probative value of the evidence. Accordingly, we find the trial court committed no abuse of discretion in this regard.

¶ 19 In his next two issues, appellant avers the evidence was insufficient to sustain his convictions for conspiracy to commit third degree murder, conspiracy to commit robbery, and accomplice to robbery.

The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proof or proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all the evidence actually received must be considered. Finally, the trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

*Commonwealth v. DiStefano,* 782 A.2d 574, 582 (Pa.Super.2001), *appeal denied,* 569 Pa. 716, 806 A.2d 858 (2002) (citations and quotations omitted).

To convict a defendant of conspiracy, the trier of fact must find that: (1) the defendant intended to commit or aid in the commission of the criminal act; (2) the defendant entered into an agreement with another (a "co-conspirator") to engage in the crime; and (3) the defendant or one or more of the other co-conspirators committed an overt act in furtherance of the agreed upon crime. The essence of a criminal conspiracy, which is what distinguishes this crime from accomplice liability, is the agreement made between the co-conspirators.

As with accomplice liability, mere association with the perpetrators, mere presence at the scene, or mere knowledge of the crime is insufficient to estab-

lish that a defendant was part of a conspiratorial agreement to commit the crime. There needs to be some additional proof that the defendant intended to commit the crime along with his co-conspirator. Direct evidence of the defendant's criminal intent or the conspiratorial agreement, however, is rarely available. Consequently, the defendant's intent as well as the agreement is almost always proven through circumstantial evidence, such as by the relations, conduct or circumstances of the parties or overt acts on the part of the co-conspirators. Once the trier of fact finds that there was an agreement and the defendant intentionally entered into the agreement, that defendant may be liable for the overt acts committed in furtherance of the conspiracy regardless of which co-conspirator committed the act.

*Commonwealth v. Murphy*, 577 Pa. 275, 292, 844 A.2d 1228, 1238 (2004).

¶ 20 Appellant was convicted of three conspiracy counts: conspiracy to commit third degree murder, conspiracy to commit robbery, and conspiracy to deliver a controlled substance. Appellant argues there was but one conspiracy, i.e. the conspiracy to sell drugs, and he maintains the evidence was insufficient to convict him on the other conspiracy counts. He contends he was merely present during the transaction between Goodine and Grant, and there was no evidence of a shared intent to commit the acts against Grant.

¶ 21 We note that even if evidence suggested appellant and his co-defendants agreed to commit several offenses, "[i]f a person conspires to commit a number of crimes, *he is guilty of only one conspiracy so long as such multiple crimes are the object of the same agreement or continuous conspiratorial relationship*." 18 Pa. C.S.A. § 903(c) (emphasis added); *see also*

*Commonwealth v. Sattazahn*, 428 Pa.Super. 413, 631 A.2d 597, 603 (1993). Accordingly, for appellant to be convicted of three counts of conspiracy, there must be separate agreements, or separate conspiratorial relationships, to support each conviction.

¶ 22 Appellant argues that his conspiracy convictions arose out of "an alleged multiple conspiracy context as opposed to a single conspiracy theory." Appellant's brief at 20. In contrast, the Commonwealth apparently argues there was one "multi-layered" conspiracy. Commonwealth's brief at 20–21. The trial court in its Opinion appears to describe one overall conspiracy, beginning with the letters appellant wrote in the fall of 2001, and culminating with the events of January 2002. *See, e.g.,* Trial Court Opinion, Mazzoni, J., 5/11/04, at 21. If this is the case, it was error for appellant to be convicted of three separate conspiracies.

¶ 23 In determining whether a single conspiracy or multiple conspiracies have been established, we must consider several relevant factors:

> The factors most commonly considered in a totality of the circumstances analysis of the single vs. multiple conspiracies issue ... are: the number of overt acts in common; the overlap of personnel; the time period during which the alleged acts took place; the similarity in methods of operation; the locations in which the alleged acts took place; the extent to which the purported conspiracies share a common objective; and, the degree to which interdependence is needed for the overall operation to succeed.

*Commonwealth v. Davis*, 704 A.2d 650, 654 (Pa.Super.1997) *citing Commonwealth v. Savage*, 388 Pa.Super. 561, 566 A.2d 272, 278 (1989). Applying the above to the facts of this case, we conclude that the

robbery and third degree murder of Grant could have been the result of only one conspiratorial agreement. Goodine shot Grant and immediately thereafter appellant and Goodine rifled through Grant's pockets and body to take the drugs and money. These acts occurred almost simultaneously, at one location, the same method was employed and the same objective was pursued. *Cf. Davis, supra* (finding only one conspiracy in the robbery and third degree murder where the use of a baseball bat on the victim encompassed both their plan to harm him while taking his money (robbery) and their plan to harm him with such disregard to the value of human life as to constitute malice, which resulted in death (third degree murder)). Appellant cannot be convicted separately for conspiracy to commit robbery and conspiracy to commit third degree murder since multiple convictions under these circumstances are explicitly precluded by statute. 18 Pa.C.S.A. § 903(c); *see also Commonwealth v. Randal*, 837 A.2d 1211, 1214 (Pa.Super.2003) (stating that an illegal sentence must be vacated). It must be determined whether the evidence was sufficient to find that the acts committed against Grant were the result of a separate conspiracy from the one to sell drugs.

¶ 24 We reiterate that the trial court in its Opinion and the Commonwealth in its brief, describe one conspiracy, beginning with the letters appellant wrote during the fall of 2001, and culminating with the events of January 2002. Upon a thorough review of the record, we find the conduct of appellant and the other three men on January 24 through January 26, 2002, was the result of one *"continuous conspiratorial relationship,"* 18 Pa.C.S.A. § 903(c), and the evidence is insufficient to prove otherwise. From the time they made their first drug sales in Scranton on Friday evening, January 25th, until Saturday evening January 26th when Grant was murdered, a period of only approximately 24 hours elapsed. All pertinent events took place in the same location, at Midtown Apartments, involved the same actors, and were in furtherance of the same objective. Appellant, therefore, can be convicted only of conspiracy to deliver cocaine, that crime being the underlying foundation of the agreement upon which the conspiracy charges were based.[6] While we are constrained to vacate the most heinous of the three conspiracy convictions (that which carried a 16 to 32 year term of imprisonment), we note appellant was sentenced to only two to five years imprisonment on the remaining conspiracy conviction; the statutory maximum sentence for that crime being 10 to 20 years imprisonment. While we vacate the convictions for conspiracy to commit third degree murder and conspiracy to commit robbery, we remand this matter for resentencing on conspiracy to deliver a controlled substance (cocaine), in deference to the trial court's sentencing scheme. *See Davis, supra* at 655. Upon remand the sentencing court should consider all possible alternatives available to it in its reassessment of appellant's punishment.

---

**6.** We note appellant argued he was convicted under a multiple conspiracy theory but, for various reasons, the evidence was insufficient to support his convictions for conspiracy to commit robbery and conspiracy to commit third-degree murder. He did not make the precise argument upon which we base our disposition of these issues, i.e. that appellant's sentence was illegal because he can, by statute, be convicted of only one count of conspiracy under the facts of this case. We note, however, that 18 Pa.C.S.A. § 903(c) precludes multiple convictions where there is but one conspiracy. "Challenges to an illegal sentence can never be waived and may be reviewed *sua sponte* by this Court." *See Commonwealth v. Randal*, 837 A.2d 1211, 1214 (Pa.Super.2003).

¶ 25 Appellant also argues that the evidence was insufficient to convict him as an accomplice to robbery.

A defendant, who was not a principal actor in committing the crime, may nevertheless be liable for the crime if he was an accomplice of a principal actor. A person is deemed an accomplice of a principal if with the intent of promoting or facilitating the commission of the offense, he: (i) solicited the principal to commit it; or (ii) aided or agreed or attempted to aid such other person in planning or committing it. Accordingly, two prongs must be satisfied for a defendant to be found guilty as an "accomplice." First, there must be evidence that the defendant intended to aid or promote the underlying offense. Second, there must be evidence that the defendant actively participated in the crime by soliciting, aiding, or agreeing to aid the principal. While these two requirements may be established by circumstantial evidence, a defendant cannot be an accomplice simply based on evidence that he knew about the crime or was present at the crime scene. There must be some additional evidence that the defendant intended to aid in the commission of the underlying crime, and then did or attempted to do so. With regard to the amount of aid, it need not be substantial so long as it was offered to the principal to assist him in committing or attempting to commit the crime.

Commonwealth v. Murphy, 577 Pa. 275, 285–286, 844 A.2d 1228, 1234 (2004) (citations omitted). "A person is guilty of robbery if, in the course of committing a theft, he ... inflicts serious bodily injury upon another." 18 Pa.C.S.A. § 3701(a)(1)(i). "An act shall be deemed 'in the course of committing a theft' if it occurs in an attempt to commit theft or in flight after the attempt or commission." Id., § 3701(a)(2).

¶ 26 Appellant argues all the elements of robbery had to be proven and they could not be since the purported theft occurred after Grant had already been shot. Eyewitness testimony revealed that immediately upon shooting Grant, Goodine began grabbing at Grant's body. Goodine himself admits he immediately grabbed the five bags of cocaine. The evidence also showed that although Grant entered the apartment with at least $200, only $1 was found on his body. Viewing this evidence in the light most favorable to the verdict winner, as we are required to do when reviewing a challenge to the sufficiency of the evidence, see DiStefano, supra, the evidence proves Goodine inflicted serious bodily injury upon Grant and that he did so in an attempt to steal money and drugs from him. Eyewitness testimony further established that appellant aided in the commission of the crime by rifling through Grant's pockets and his person. Sanders testified that immediately upon the firing of the shot, appellant jumped up and appellant and Goodine grabbed at Grant so fast, "like they was [sic] at work or something." N.T., 6/9/03, at 60. After leaving, appellant returned and took the last bit of cocaine from the body. The evidence clearly indicates appellant assisted in the commission of the robbery. Viewed in the light most favorable to the Commonwealth, we find this evidence satisfies both prongs of the above test, i.e. that appellant intended to aid in the commission of the crime, and did, in fact, do so.

¶ 27 Appellant next alleges the court wrongly instructed the jury with regard to appellant's role as co-conspirator, particularly as to the charge of conspiracy to commit third degree murder. He argues that since the charges against him could only be pursued under a multiple conspiracy rather than a single conspiracy theory, he requested that the trial court provide a

separate and distinct set of instructions for each particular crime charged. Our above disposition of appellant's allegations of error as to his conspiracy convictions renders this issue moot.

¶ 28 Finally, appellant alleges the trial court erred by denying appellant's request for an instruction on the lesser included offense of theft. He argues the jury could have concluded from the evidence that "prior to fleeing the scene after the shooting, [appellant] seized the opportunity to pilfer Grant's corpse," and only did so as "an afterthought following the spontaneous shooting of Grant by Goodine." Appellant's brief at 36–37. "A defendant is entitled to a charge on a lesser-included offense only where the offense has been made an issue in the case *and the evidence would reasonably support such a verdict." Commonwealth v. Gwynn,* 555 Pa. 86, 106, 723 A.2d 143, 152 (1998), *citing Commonwealth v. Yarris,* 519 Pa. 571, 549 A.2d 513, 527 (1988), (emphasis supplied). Here, we find the evidence does not reasonably support a verdict of *theft;* rather, it supports a verdict of *robbery.* There is no question that Goodine shot Grant in the head and that the evidence overwhelming supports a finding that Goodine did so in an effort to take the drugs and money from Grant. It is important to remember that appellant was convicted *as an accomplice* to robbery. The evidence overwhelmingly indicates that appellant aided in this crime when he, in his own words, "pilfered Grant's corpse" immediately upon the shot being fired. We find the trial court committed no error by failing to instruct the jury as to theft under these facts.

¶ 29 Appellant's convictions of conspiracy to commit third degree murder and conspiracy to commit robbery are vacated.[7] Case remanded for resentencing on the conviction of conspiracy to deliver a controlled substance; the remaining judgments of sentence are affirmed. Jurisdiction relinquished.

---

7. Relying upon *Commonwealth v. Clinger,* 833 A.2d 792 (Pa.Super.2003), appellant argued he could not be convicted of conspiracy to commit third degree murder because a conspiracy conviction requires an intent to promote or facilitate the commission of a crime, and, appellant contends, there cannot be intent to commit an unintended murder. By reason of our disposition of appellant's challenge to his conviction for conspiracy to commit third degree murder, we need not explore the issue of whether third degree murder can be the subject of a conspiracy charge.