J-S70005-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| JOHN CORNISH | |
| Appellant | No. 1862 EDA 2013 |

Appeal from the Judgment of Sentence May 17, 2013
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0005385-2009

BEFORE:  LAZARUS, J., MUNDY, J., and STRASSBURGER, J.[*]

MEMORANDUM BY LAZARUS, J.:                **FILED NOVEMBER 24, 2014**

John Cornish appeals from his judgment of sentence, entered in the Court of Common Pleas of Philadelphia County, after being found guilty in a non-jury trial of third-degree murder,[1] conspiracy to commit aggravated assault,[2] and possession of an instrument of crime (PIC).[3]  Cornish was sentenced to 20-40 years in prison and a consecutive 5-10 year sentence for his conspiracy conviction.[4]

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] 18 Pa.C.S. § 2502(c).

[2] 18 Pa.C.S § 903.

[3] 18 Pa.C.S. § 907.

[4] No further penalty was imposed on Cornish's PIC conviction.

Cornish, in collusion with his co-defendant Johnson,[5] was involved in the shooting death of fifty-seven-year-old Stephen Tucker while Tucker drove his gold Mercury Grand Marquis near 29th and Thompson Streets in the City of Philadelphia on October 5, 2008. Police uncovered several used gun cartridge casings at the scene of the crime, which a ballistics' expert later identified as having come from two different weapons, a 9mm or .38mm handgun and a shotgun. No firearms were recovered from the scene.

The trial court summarized the evidence as follows:

Police Officer James Miller testified that shortly before 11 p.m. on October 5, 2008, he was called to the area of 2900 Thomson Street in Philadelphia. He saw a gold Mercury Grand Marquis. The driver's window appeared to be shot out. A black male, later identified as the decedent, Stephen Tucker[,] was slumped over and unresponsive. He appeared to have been shot on the left side. The officer took the victim to Hahnemann Hospital where he was pronounced dead. N.T. 1/20/12, [at] 20-24.

The Medical Examiner, Dr. Sam Guilino[,] testified that the victim died of a gunshot wound to his chest. The bullet entered the left side of his chest, and went through the left lung, the left subclavian artery and vein. The bullet then penetrated into the neck, going through the trachea, the carotid artery and the jugular vein. The bullet lodged in the right side of the neck and was recovered. N.T. 1/31/12, [at] 11-14.

Hakeen Savage testified that he was inside "Ms[.] P's" house near the shooting scene when he heard gunshots. He further testified that after the gunfire stopped [Cornish and Johnson] came running into the house. One had a shotgun and one had a

---

[5] Johnson has also appealed from his judgment of sentence at No. 2737 EDA 2013.

handgun. The witness testified that he could not remember which defendant had which weapon. He further testified that when they came in, one of the defendants said, "Don't go outside. Somebody just got shot." However, in a signed statement given to the police approximately three (3) months after the shooting . . . the witness gave a different version of events. In that statement, the witness said that right after the shooting both defendants came running into the house breathing heavily. [Johnson] was the one armed with the shotgun. [Cornish] said, "Don't go outside. We just rocked someone." The witness understood the word "rocked" to mean killed. [*Id.* at] 98-109.

Kareen Savage was called and questioned about a statement that [Cornish] made to him after the shooting admitting to being one of the shooters. The witness denied that [Cornish] made any statement to him. The witness did acknowledge that he gave a signed statement to the police detailing the substance of that conversation. However the witness testified that he lied in his statement. In that statement [S]avage detailed a conversation he had with [Cornish] after the shooting. [Cornish] admitted to doing the killing with another person. [Cornish] stated that the motive appeared to be one of mistaken identity, as the decedent was driving a care [sic] that the intended target, a person named "Mansy" was known to drive. N.T. 2/1/12, [at] 6-14 [] (testimony of Kareem Savage)[;] N.T. 2/13/12, [at] 52-58 (testimony of Timothy Scally.)[.]

Darnell Corbitt testified that he was in the car with the decedent at the time of the shooting. At trial the witness testified that after stopping at a bar at 29th and Girard, he heard gunshots from more than one gun and jumped out of the car. At trial he denied having any more information about the shooting or the shooters. However, in a signed statement given to Homicide Detective John McNamee approximately three weeks after the shooting, the witness also gave a different version of events. In that statement the witness identified photographs of both defendants as the shooters. N.T. 1/31/12, [at] 40-66 (testimony of Darnell Corbitt); N.T. 2/1/12, [at] 25-36 (testimony of Detective John McNamee).

Dandrea Brown testified before this [c]ourt on November 4, 2010. Her testimony was preserved prior to trial, as she was suffering from ovarian cancer. She lived in the house at 2907 West Flora Street, which was used for the packaging of drugs by

[defendant], his co-defendant, the Savage brothers and others. She was upstairs at the time of the shooting. She came downstairs. A few seconds after the shooting [defendant] and his co-defendant came running inside. [Codefendant] was holding a shotgun and [defendant] had a handgun. [Codefendant] told her to clean the guns and store them. She complied. N.T. 11/04[/]10, [at] 4-69.

Bullet holes were observed in the driver[']s side car door. Forensic evidence recovered from the crime scene outside the car included six (6) fired cartridge casings, three (3) bullet specimens and one (1) buckshot from a . 12 gauge shotgun. No fingerprints were recovered from the crime scene, nor was a gun recovered. N.T. 1/30/12, 29-48. (Testimony of Officer Fitler.) One additional projectile and additional bullet fragments were recovered from inside the car door. N.T. 1/31/12, [at] 20-35. (Testimony of Officer Flade.)

Police Officer Stephen Ahmie, a ballistics expert [,] examined all of the ballistics evidence. The ballistic evidence recovered from the car door consisted of two (2) types, .00 buckshot consistent with coming from a shotgun shell and a bullet consistent with being from a .38 [caliber or 9-]millimeter [weapon]. The bullet recovered from the victims neck also was consistent with a .38 [caliber or 9-]millimeter [weapon]. The other ballistic evidence recovered at the crime scene consisted of seven (7) fired cartridge casings and one (1) fired shotgun shell. The fired cartridge casings all were [9-]millimeter and all were fired from the same gun. The fired shotgun shell was [a] .12 gauge and was consistent with ... the buckshot recovered. N.T. 2/1/12, [at] 62-77.

Trial Court Opinion, 4/23/14, at 2-5 (footnotes omitted).

Before trial, Dandrea Brown testified before the trial judge and was subject to cross-examination by both defense counsel.[6] In her testimony, Ms. Brown testified that six weeks prior to the murder, she agreed that in

---

[6] Because Ms. Brown had ovarian cancer, her testimony was videotaped to preserve it in anticipation of a future jury trial.

exchange for $500, she would let the Defendants and the Savage brothers use her home for their crack cocaine operations. After Ms. Brown and the co-defendants were arrested for drug-dealing in January 2009, she gave the police a statement about the Tucker murder. She also identified both co-defendants and described the guns they ran into the house with immediately following the shooting, which they asked her to clean and store for them.

Cornish and Johnson were tried together and, after a four-day bench trial, the court found them guilty of the aforementioned crimes. Cornish was sentenced to 20-40 years for murder and a consecutive sentence of 5-10 years for conspiracy. He filed timely post-sentence motions that were denied. Cornish now appeals, raising the following issues for our consideration:

> (1) Whether the evidence was insufficient as a matter of law to sustain the convictions of third-degree murder, conspiracy to commit aggravated assault, and possession of an instrument of crime.
>
> (2) Whether the convictions of third-degree murder and conspiracy to commit aggravated assault should have merged for sentencing purposes.

Cornish claims that that the Commonwealth failed to prove the requisite level of intent to commit each of the crimes for which he was convicted. With regard to his third-degree murder conviction, Cornish specifically asserts that the alleged motive the Commonwealth proposed he had to commit the crimes is not borne out by the evidence and could not

support a finding of any level of intent to commit third-degree murder. We disagree.

In reviewing a challenge to the sufficiency of the evidence, we must determine whether, viewing the evidence in the light most favorable to the Commonwealth as verdict winner, together with all reasonable inferences therefrom, the trier of fact could have found that each and every element of the crimes charged was established beyond a reasonable doubt. **Commonwealth v. Randall**, 758 A.2d 669, 674 (Pa. Super. 2000).

Third-degree murder, a first-degree felony, is defined in this Commonwealth as, "[a]ll other kinds of murder of the third degree." 18 Pa.C.S. § 2502(c). Notably, section 2502(c) does not list elements or specify a requisite *mens rea*. In **Commonwealth v. Fisher**, 80 A.3d 1186- (Pa. 2013), our Supreme Court noted:

> The Crimes Code further provides where a statute, such as [section] 2502(c), does not prescribe the culpability sufficient to establish a material element of the offense, **such element is established if the defendant acted "intentionally, knowingly or recklessly[.]"** *Id.*, § 302(c). Thus, a defendant who acts intentionally in attacking his victim may still be convicted of third[-]degree murder.

*Id.* at 1191 (emphasis added), citing 18 Pa.C.S § 302(c). **See Commonwealth v. Meadows**, 787 A.2d 312, 217 (Pa. 2001) (to convict defendant for third-degree murder, factfinder need not consider whether defendant had specific intent to kill, nor make any finding with respect thereto); *see also Commonwealth v. Santos*, 876 A.2d 360 (Pa. 2005) (for third-degree murder conviction, Commonwealth need only prove that

defendant killed another person with malice aforethought; malice consists not only of ill-will, but also wickedness of disposition, hardness of heart, recklessness of consequences, and mind regardless of social duty, even though particular person may not be intended to be injured).

Here, an eyewitness observed Cornish fire a handgun at the victim. At trial, several Commonwealth witnesses corroborated that Cornish was one of two gunmen involved in the victim's fatal shooting. Immediately following the shooting, Cornish and his co-defendant burst into a house warning the occupants, "Don't go outside, [w]e just rocked [another word for shot] someone." Finally, a ballistics analysis confirmed that a handgun, like the one the eyewitness saw Cornish fire at the victim, was used to fatally shoot Tucker. This evidence sufficiently proves malice and, therefore, the requisite intent to commit third-degree murder. *See Commonwealth v. Seibert*, 622 A.2d 361, 366 (Pa. Super. 1993) (malice inferred from use of deadly weapon on vital part of body; law infers or presumes from use of deadly weapon, in absence of circumstances of explanation or mitigation, existence of malice).

With regard to his conspiracy conviction, Cornish claims that the Commonwealth failed to prove that he had the intent to enter into an agreement with his co-defendant to commit a crime. The murder, he asserts, was merely an "unexpected event" that occurred between him and the co-defendant who were merely "associated."

A criminal conspiracy may be found where there is evidence that: (1) a defendant intended to commit or aid in the commission of a criminal act, (2) **the defendant entered into an agreement with another**, i.e., the co-conspirator, to engage in a crime, and (3) the defendant or one or more of the other co-conspirators committed an overt act in furtherance of the agreed upon crime. *Commonwealth v. Little*, 879 A.2d 293 (Pa. Super. 2005) (emphasis added). The essence of a criminal conspiracy, which is what distinguishes this crime from accomplice liability, is the agreement made between the co-conspirators. *Commonwealth v. Barnes*, 871 A.2d 812 (Pa. Super. 2005). An agreement can be inferred from the circumstances by considering the parties' relation, conduct, and circumstances. *Commonwealth v. Kennedy*, 453 A.2d 927, 930 (Pa. 1982)

Based on the evidence presented at trial, the judge could reasonably infer that the co-defendants acted in concert to kill the victim. Cornish and his co-defendant approached the victim together, each brandishing a gun, and fired their weapons simultaneously at their target. They immediately fled from the crime scene together, entering Ms. Brown's house where they confessed to the shooting and asked Ms. Brown to clean and store their weapons. The evidence also established that Cornish and Johnson were friends who were associated in a drug operation run out of Ms. Brown's home and who both believed that the victim was their drug rival.

Accordingly, the evidence was sufficient to prove criminal conspiracy. ***Barnes***, ***supra***.

With regard to his PIC conviction, Cornish asserts that there was insufficient evidence to prove his intent to commit the crime. PIC is defined as "[the] posses[sion of] any instrument of crime with the intent to employ it criminally." 18 Pa.C.S. § 907. Having found that the evidence sufficiently proved that Cornish used a deadly weapon on a vital part of the victim's body, this argument is meritless. ***Seibert***, ***supra***.

Finally, Cornish claims that his convictions for third-degree murder and conspiracy to commit aggravated assault should have merged for sentencing purposes because they are based upon the same facts. We disagree.

Pennsylvania's merger doctrine, codified at 42 Pa.C.S. § 9765 states:

> No crimes shall merge for sentencing purposes unless the crimes arise from a single criminal act **and all of the statutory elements of one offense are included in the statutory elements of the other offense**. Where crimes merge for sentencing purposes, the court may sentence the defendant only on the higher graded offense.

42 Pa.C.S. § 9765 (emphasis added); ***see also Commonwealth v. Kimmel***, 2014 PA Super 186 (Pa. Super. filed August 29, 2014) (two distinct facts must be present for merger: 1) crimes arise from single criminal act; and 2) all of statutory elements of one offense is included in statutory elements of other). Moreover, the question of merger implicates the legality of a sentence; our standard of review is de novo and the scope

of our review is plenary. ***Commonwealth v. Tanner***, 61 A.3d 1043, 1046 (Pa. Super. 2013).

In ***Commonwealth v. Allen***, 24 A.3d 1058, 1063 (Pa. Super. 2011), our Court reiterated that the courts of this Commonwealth are to apply an elements-based test when determining questions of merger at the time of sentencing. A plain language interpretation of section 9765 reveals the General Assembly's intent to preclude the courts of the Commonwealth from merging sentences for two offenses that are based on a single criminal act unless all of the statutory elements of one of the offenses are included in the statutory elements of the other. ***Id.***

Here, the statutory elements of third-degree murder were distinctly different from the elements of conspiracy to commit aggravated assault. Therefore, the trial court properly determined that Cornish's sentences for those offenses should not merge. ***Allen***, ***supra***.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: <u>11/24/2014</u>