**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| SHAREEF THOMAS | : | |
| | : | |
| Appellant | : | No. 380 EDA 2023 |

Appeal from the Judgment of Sentence Entered January 11, 2023
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0003621-2020

BEFORE: BOWES, J., McLAUGHLIN, J., and BECK, J.

MEMORANDUM BY McLAUGHLIN, J.: **FILED DECEMBER 23, 2024**

Shareef Thomas appeals from the judgment of sentence entered following his convictions for first-degree murder and conspiracy to commit murder.[1] Thomas challenges the sufficiency of the evidence and evidentiary rulings. We affirm.

The trial court summarized the facts as follows:

> On August 9, 2020, Shaquan Gleaves was shot and killed on the 100 block of East Sharpnack Street in Philadelphia. Police recovered and reviewed a recording of the shooting which showed three (3) individuals emerging from a silver Volvo, firing several shots at Gleaves, returning to the Volvo, then fleeing the scene of the crime. Police later recovered the silver Volvo seen in the recording and determined that it was registered to Karon Lemar. As a result of a separate, unrelated investigation into Lemar, police uncovered several conversations on Lemar's phone between him and [Thomas] in which they discussed and planned the killing of an individual named "Abby." Gleaves

---

[1] 18 Pa.C.S.A. §§ 2502(a) and 903, respectively.

was shot and killed because he had been mistaken for Abby. As [Thomas] was on probation for an unrelated offense, he was subject to GPS ankle monitoring when Gleaves was murdered. Police reviewed the data associated with [Thomas's] ankle monitor and found that it placed [Thomas] at the scene of the murder when it happened and corresponded with the movement of the silver Volvo in the video recording.

Trial Court Opinion, filed 10/16/23, at 1-2.[2]

Prior to trial, Thomas filed a motion in limine to preclude a photograph of himself holding a firearm that he texted to Lemar and that was posted on Instagram prior to the shooting. He also sought to preclude text messages between himself and Lemar that were recovered from Lemar's cell phone during the weeks surrounding the shooting. After a hearing on the motion, the trial court permitted the admission of the photograph and certain text messages.

A jury found Thomas guilty of first-degree murder and conspiracy to commit murder. The jury found Thomas not guilty of firearms not to be carried without a license, carrying firearms on public streets or public property in Philadelphia, and possessing an instrument of crime. The court sentenced Thomas to life imprisonment without the possibility of parole on the first-degree murder conviction and a concurrent sentence of ten to 20 years' imprisonment on the conspiracy to commit murder conviction. Thomas filed post-sentence motions, which were denied. This appeal followed.

_____

[2] For a more detailed recitation of the facts, **see** Trial Ct. Op. at 2-15.

- 2 -

Thomas raises the following issues in his Statement of Questions Involved:

1. Was the verdict against the weight of the evidence?

2. Was the evidence sufficient to establish [Thomas's] guilt beyond a reasonable doubt for each offense?

3. Did the trial [c]ourt err when it failed to grant a judgment of acquittal, as the Commonwealth failed to establish beyond a reasonable doubt that [Thomas] killed the decedent or conspired to do same?

4. Did the trial [c]ourt err when it failed to grant an arrest of judgment, as the Commonwealth failed to establish beyond a reasonable doubt that [Thomas] killed the decedent or conspired to do same?

5. Did the trial [c]ourt err when it failed to grant a mistrial, as the Commonwealth failed to establish beyond a reasonable doubt that [Thomas] killed the decedent or conspired to do same?

6. Did the trial [c]ourt err when it failed to exclude all Attenti (ankle monitoring tracking) data as inherently unreliable?

7. Did the trial [c]ourt err when it failed to exclude all social media (e.g., Instagram or Facebook) postings attributable to [Thomas] as irrelevant and unduly prejudicial?

8. Did the trial [c]ourt err when it failed to bar any social media (e.g., Instagram or Facebook) conversations between [Thomas] and Karon Lemar and/or [Thomas] and any other individuals as inadmissible hearsay, violative of the Sixth Amendment right to confrontation [**Bruton v. United States**, 391 U.S. 123 (1968)]?

9. Did the trial [c]ourt err when it failed to bar any social media postings an[d]/or any oral and/or written statements made by Karon Lemar as inadmissible hearsay, violative of the Sixth Amendment right to confrontation.

- 3 -

10.     Did the trial [c]ourt err when it failed to bar any social media and/or other pictures/images/videos that allegedly showed [Thomas] holding a firearm as irrelevant and unduly prejudicial?

11.     Did the trial court err by not declaring a mistrial when [Thomas] was COVID positive and could not appear live in the Courtroom for three critical trial steps: the jury charge (instructions), jury questions, and the reading of the verdict?

Thomas's Br. at 7-8.

While Thomas's Statement of Questions Involved listed eleven issues, the argument section of his appellate brief only addressed issues two, eight, and ten. **See** Thomas's Br. at 11-12, 13, 19, 21. Therefore, issues one, three through seven, nine, and eleven are waived. **See** Pa.R.A.P. 2119(a) (providing that "[t]he argument shall be divided into as many parts as there are questions to be argued"); **Commonwealth v. Phillips**, 141 A.3d 512, 522 (Pa.Super. 2016) (stating that "issues raised in a [b]rief's Statement of Questions Involved but not developed in the [b]rief's argument section will be deemed waived").

Thomas first argues the evidence was insufficient to establish that he committed first-degree murder. He maintains that "no documentary, testimonial, forensic, or digital evidence established that [he] was *in the vehicle* at the time of the shooting." Thomas's Br. at 11 (emphasis in original). He argues that "[d]espite comprehensive forensic testing, no fingerprint or DNA evidence linked [him] to the vehicle, and no ankle-monitoring data established that [he] was in the vehicle." **Id.** Thomas asserts that since the jury found him not guilty of the firearms offenses, the jurors must have

- 4 -

believed that he was not one of the shooters. *Id.* He also points out Detective Thorsten Lucke's testimony changed during the trial from first stating there were three people who emerged from the vehicle to stating that there was a fourth person, the driver. *Id.* at 17. In his view, "[a]bsent this change in testimony, there were three (3) passengers in the vehicle, and they were the three (3) shooters." *Id.* at 18. He maintains that because he was found not guilty of the firearms offenses, and in view of the initial testimony that there were three shooters, "he could . . . not have been a shooter, and thus not in the vehicle at the time of the shooting." *Id.*

Thomas further argues the evidence was insufficient to establish that he entered into a conspiratorial agreement to commit murder. He maintains that none of the cell phone messages between himself and Lemar "plotted the murder of Mr. Gleaves or referenced the commission of the murder." *Id.* at 19. According to Thomas, the Commonwealth at most "established a loose affiliation with a group of people who had a conflict with, according to the Commonwealth, the intended target of the murder." *Id.*

The sufficiency of the evidence is a question of law. Therefore, "[o]ur standard of review is *de novo*, and our scope of review is plenary." ***Commonwealth v. Mikitiuk***, 213 A.3d 290, 300 (Pa.Super. 2019). When reviewing a challenge to the sufficiency of the evidence, we "must determine whether the evidence admitted at trial, and all reasonable inferences drawn therefrom, when viewed in a light most favorable to the Commonwealth as verdict winner, support the conviction beyond a reasonable doubt."

*Commonwealth v. Feliciano*, 67 A.3d 19, 23 (Pa.Super. 2013) (*en banc*) (citation omitted). "Where there is sufficient evidence to enable the trier of fact to find every element of the crime has been established beyond a reasonable doubt, the sufficiency of the evidence claim must fail." *Id.* (citation omitted). This standard applies equally where the Commonwealth's evidence is circumstantial. *Commonwealth v. Patterson*, 180 A.3d 1217, 1229 (Pa.Super. 2018). In conducting the sufficiency analysis, "we may not substitute our judgment for that of the factfinder." *Commonwealth v. Griffith*, 305 A.3d 573, 576 (Pa.Super. 2023), *appeal denied*, 319 A.3d 503 (Pa. 2024). "The factfinder is free to believe all, part, or none of the evidence." *Id.* at 577.

"To sustain a conviction for first-degree murder, the Commonwealth must prove that: (1) a human being was unlawfully killed; (2) the accused was responsible for the killing; and (3) the accused acted with malice and a specific intent to kill." *Commonwealth v. Williams*, 176 A.3d 298, 306-07 (Pa.Super. 2017).

"To convict a defendant of conspiracy, the trier of fact must find that: (1) the defendant intended to commit or aid in the commission of the criminal act; (2) the defendant entered into an agreement with another (a 'co-conspirator') to engage in the crime; and (3) the defendant or one or more of the other co-conspirators committed an overt act in furtherance of the agreed upon crime." *Commonwealth v. Barnes*, 871 A.2d 812, 819 (Pa.Super. 2005) (citation omitted). "The essence of a criminal conspiracy, which is what

distinguishes this crime from accomplice liability, is the agreement made between the co-conspirators." ***Id.*** (citation omitted).

Although direct evidence of the defendant's criminal intent or the conspiratorial agreement "is rarely available," the Commonwealth may prove the defendant's intent and the agreement "through circumstantial evidence, such as by the relations, conduct or circumstances of the parties or overt acts on the part of the co-conspirators." ***Id.*** at 820 (citation omitted). If the trier of fact finds an agreement existed, and that the defendant intentionally entered into it, the defendant "may be liable for the overt acts committed in furtherance of the conspiracy regardless of which co-conspirator committed the act." ***Id.*** (citation omitted).

Here, the Commonwealth presented the testimony of Detective Lucke, an expert in call detail record and cellular analysis, digital surveillance, video recovery and analysis, and mobile deviation examinations, including GPS. N.T., 12/16/22, at 90, 105. Thomas was on GPS ankle monitoring supervision for an unrelated offense at the time of the shooting. ***Id.*** at 89. Detective Lucke testified that he analyzed the GPS data associated with Thomas's device along with recovered video surveillance footage related to the shooting to track Thomas's movements at the time of the shooting, which he narrated for the jury. ***Id.*** at 113. The trial court summarized Detective Lucke's testimony as follows:

> At 6:01:59 p.m., a GPS point showed [Thomas] at his home on 218 West Clapier Street. A GPS point captured at 6:03:18 p.m. indicated that [Thomas] was no longer at

home and had begun to move. At 6:22:22 p.m., a GPS point placed [Thomas] at 124 West Logan Street, Karon Lemar's residence. [Thomas's] device remained stationary until 6:29:22 p.m., when it began travelling north toward the scene of the crime. At 6:35:35 p.m., a camera from a grocery store on the corner of Germantown Avenue and Sharpnack street captured footage of a silver Volvo turning at this intersection onto Sharpnack Street. This footage corroborated a GPS coordinate showing [Thomas's] device travelling at about nineteen (19) miles per hour, turning off Germantown Avenue onto Sharpnack Street. This footage also showed a silver Ford Taurus traveling behind the Volvo. From 6:37:59 until 6:40:22 p.m., [Thomas's] ankle monitor device produced coordinates consistent with him circling Sharpnack Street multiple times. Camera footage showed the silver Volvo travelling in the same pattern, in the same location, and at the same rate of speed as [Thomas's] ankle monitor device. N.T. 12/16/2022, at 122-138.

At around 6:46 p.m., footage was captured of the Ford Taurus parking at the intersection of East Upsal and Ross Street, pointed west. Detective Lucke testified that the video footage from the residence showing three (3) individuals emerging from the Volvo and shooting at Gleaves was from 6:47 p.m. Footage from the corner store then showed the silver Volvo fleeing the scene at 6:47:24 p.m. [Thomas's] ankle monitor device generated a GPS coordinate that placed him in front of the store at precisely the same time. Finally, [Thomas's] ankle monitor device produced coordinates from 6:51 to 6:55 p.m. showing [Thomas] travelling south toward the addresses of [Thomas's] and Lemar's homes. *Id.* at 138-48.

Trial Ct. Op. at 25-26.

Detective Lucke further testified about numerous text messages exchanged between Thomas and Lemar in the weeks leading up to the shooting, wherein they discussed the buying and trading of firearms and bullets. N.T., 12/16/22, at 155-173. Detective Lucke testified that on the night prior to the murder, Thomas sent a message to Lemar stating, "His brother

gots to go." *Id.* at 167. Thomas then sent Lemar a screenshot of an argument between two unknown individuals. *Id.* at 167-68. In the last message of the screenshotted argument, one of the individuals texted, "ok plz don't hurt my Lil brother. I'm so sorry." *Id.* at 168. Lemar responded by stating, "He pussy," to which Thomas responded, "No he dead." *Id.* Lemar then wrote, "You not gonna ever see him." Thomas responded, "Yea u really bout to not see him," with laughing crying emojis. *Id.* at 168-69. The two then confirmed the intended target's location and Thomas stated, "Bro we gotta just park on they block." *Id.* at 169. Lemar responded, "I know," to which Thomas responded, "Only me Nd u should go." *Id.* Thomas then requested that Lemar get more bullets from an individual named "leaf." *Id.*

Thomas and Lemar continued their conversation the following morning, which was the day of the shooting. *Id.* at 169-70. At 11:46 a.m., Lemar wrote, "Abby keep posting shit about dying." *Id.* at 170. Communication between Thomas and Lemar then stopped until Lemar sent a screenshot from Citizens App[3] at 7:19 p.m., approximately 30 minutes after the shooting. *Id.* Detective Lucke testified the screenshot showed a report of the shooting and was entitled, "Man shot multiple times, Ross Street and East Sharpnack Street." *Id.* at 171. There was a comment on the Citizens App post that said, "Damn

---

[3] Detective Lucke explained that Citizens App is a user-driven app where people report incidents, including incidents of crime, that are occurring in their neighborhood. N.T., 12/16/22, at 170.

quan," which Detective Lucke explained likely referencing the shooting victim, Shaquan Gleaves. *Id.*

The Commonwealth also presented the testimony of Detective John Maha, who confirmed that the records obtained from Thomas's ankle monitor placed Thomas at the scene of the shooting. N.T., 12/20/22, at 47. Detective Maha also testified that he reviewed the video surveillance footage of the shooting "hundreds of times" and observed that there were three shooters who got out of the Volvo, along with a driver who did not exit the vehicle. *Id.* at 38-39. He stated, "There's definitely three shooters and a driver, so I believe four people all together," and "I definitely can tell you there's a driver that never gets out of that vehicle." *Id.* Detective Maha also observed that the Volvo sustained considerable gunfire damage. *Id.* at 38.

The trial court found that the evidence was sufficient to support Thomas's convictions for first-degree murder and conspiracy to commit murder. It explained:

> The evidence, when viewed in the light most favorable to [Thomas] as verdict winner, . . . established that the GPS data from [Thomas's] ankle monitor device placed him in the silver Volvo, the vehicle from which three (3) individuals emerged to shoot at Shaquan Gleaves. [Thomas's] movements, as captured by his ankle monitor device, were consistent with the movements of the silver Volvo before and after the homicide . . .
>
> [Thomas's] presence in this Volvo at the time of the murder is sufficient to establish that he committed an overt act in furtherance of the conspiracy to unlawfully kill Abdjura El ["Abby"]. Detective Maha testified that the footage which captured the events of the shooting showed three (3) people emerging from the vehicle to carry out the murder and a

fourth person driving the Volvo. Police were not able to identify any of these four (4) individuals from the footage alone. Because the GPS data placed [Thomas] in the Volvo, however, [Thomas] necessarily was either the driver or one (1) of the three (3) shooters who carried out the murder. [Thomas] and his co-conspirators had intended to target Abdjura El, but mistakenly killed Gleaves instead. Accordingly, regardless of which of these roles [Thomas] filled, the evidence was nonetheless sufficient to convict [Thomas] of [c]onspiracy to [c]ommit [m]urder beyond a reasonable doubt.

As a result of [Thomas's] actions and the actions of the other individuals in the Volvo with [Thomas], Shaquan Gleaves was unlawfully killed . . .

Even if [Thomas] was the driver who remained in the vehicle for the duration of the shooting itself, never possessed or operated a firearm at any point, and instead simply drove the shooters to and from the scene of the crime, [Thomas] could be convicted of [m]urder of the [f]irst [d]egree under a theory of conspiratorial liability. The jury may have contemplated this exact scenario in finding [Thomas] guilty of [m]urder of the [f]irst [d]egree and [c]onspiracy to [c]ommit [m]urder while acquitting him of offenses under the Uniform Firearms Act. When the three (3) shooters fired at Shaquan Gleaves, thereby killing him, each took an action in furtherance of the conspiracy to which [Thomas] was a party.

Trial Ct. Op. at 27-28.

The court did not err. Surveillance video from the scene of the shooting showed three individuals get out of Lemar's Volvo and shoot at the victim before driving away. The Volvo's movements on the surveillance video aligned with Thomas's movements tracked by his GPS ankle monitor. That Thomas's GPS ankle monitor placed him at the scene of the shooting, coupled with the texts between Thomas and Lemar, was sufficient evidence to support

Thomas's convictions for first-degree murder and conspiracy to commit murder.

In his remaining two issues, Thomas challenges the trial court's evidentiary rulings. Thomas first argues that the court should not have admitted the photograph that was posted on social media, showing him holding a firearm. He maintains that the photograph was "unduly prejudicial relative to its probative value and in no way establishes a link to the criminal conspiracy to commit murder, as no forensic or ballistics evidence linked the firearm in the photograph to the ballistics evidence at the crime scene." Thomas's Br. at 11-12. In Thomas's view, the photograph had no evidentiary value and "could only have been introduced to suggest that [he] had a propensity for street life and/or violence." *Id.* at 20. He points out that there was no evidence that the firearm in the photograph was a real firearm or that it was linked forensically to the victim's murder or the crime scene. *Id.*

The admission of evidence is within the discretion of the trial court and will only be reversed where there is an abuse of that discretion. ***See Commonwealth v. Radecki***, 180 A.3d 441, 451 (Pa.Super. 2018). An abuse of discretion exists where the court overrides or misapplies the law or exercises judgment in a way "that is manifestly unreasonable, or the result of bias, prejudice, ill will or partiality, as shown by the evidence of record." *Id.* (citation omitted).

"All relevant evidence is admissible, except as otherwise provided by law. Evidence that is not relevant is not admissible." Pa.R.E. 402. "Evidence

- 12 -

is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Pa.R.E. 401. However, the court may exclude relevant evidence if its probative value is outweighed by unfair prejudice. Pa.R.E. 403. "Unfair prejudice" is defined as "a tendency to suggest decision on an improper basis or to divert the jury's attention away from its duty of weighing the evidence impartially." Pa.R.E. 403 cmt.

Here, the photograph at issue depicted Thomas holding a 9mm or a .45-caliber handgun. Thomas sent this photograph to Lemar 12 days before the murder. The photograph was also saved as Thomas's profile picture in his Instagram account. As set forth previously, Thomas and Lemar sent multiple text messages to each other in the days leading up to the murder in which they discussed the buying and trading firearms.

The court found that the photograph's probative value outweighed any prejudicial effect. *See* N.T. Suppression Hearing, 2/2/22, at 26. It opined:

> The Commonwealth sufficiently explained the probative value of the picture in that it helped establish a link to the conspiracy which ultimately resulted in the homicide of Shaquan Gleaves. The picture was sent by [Thomas's] phone number to a phone number belonging to Karon Lemar, who the Commonwealth deemed an "unindicted, unarrested co-conspirator" in the homicide of Gleaves. The mere fact that [Thomas] used this picture as a profile picture on his Instagram account solidified that it was [Thomas] himself holding the firearm in the image.
>
> Accordingly, this demonstrated that [Thomas] had access to a firearm prior to the homicide, while the content of the subsequent text conversations between [Thomas] and Lemar revealed [Thomas's] intent to acquire another

- 13 -

> firearm. Either of these firearms – the one seen in the picture and the one discussed thereafter – could conceivably have been one (1) of the three (3) firearms used in the killing of Gleaves, which were all different calibers.

Trial Ct. Op. at 41.

The court did not err in admitting the photograph. The photograph was relevant to show that Thomas had access to a 9mm or a .45-caliber handgun shortly before the shooting. Although the murder weapon was never recovered, 35 fired cartridge casings (FCCs) were recovered at the scene. **See** N.T., 12/16/22, at 24. The FCCs were from three different calibers of firearms, including from a 9mm and a .45-caliber. **See id.** Thus, the photograph was probative to show that Thomas had access to the same types of guns that were used in the shooting. No relief is due on this claim.

In his final claim, Thomas argues that the admission of the text messages between himself and Lemar, including the statements, "You know we killed ya mans," "Damn quan," "he pussy," and "no, he dead," violated his constitutional right to confrontation. Thomas's Br. at 21, 23-24. He asserts that since Lemar was not arrested or indicted, he was unable to cross-examine Lemar as to the statements' authentication or veracity. **Id.** at 24.

Thomas argues that the admission of Lemar's statements violated his Sixth Amendment right to confrontation under **Bruton v. United States**, 391 U.S. 123 (1968). There, "the United States Supreme Court held that a defendant's Confrontation Clause rights are violated when his non-testifying co-defendant's confession naming him as a participant in the crime is introduced at a joint trial, even when accompanied by a jury instruction that

the confession may be considered only against the co-defendant." ***Commonwealth v. Smith***, \_\_\_A.3d\_\_\_, No. 92 MAP 2021, 2024 WL 4558945, \*5 (Pa. Oct. 24, 2024) (citing ***Bruton***, 391 U.S. at 135-36). Thomas argues that Lemar should have been treated as if he was a co-defendant since "[t]he spirit of ***Bruton*** is to preclude hearsay testimony by shielding from the jury inculpatory statements made by a co-conspirator, of which Karon Lemar was." Thomas's Br. at 21, 23. He concludes that "[h]ad these communications between [Thomas] and Mr. Lemar not been admitted into evidence, the Commonwealth could not have proven beyond a reasonable doubt that the Petitioner entered into a conspiratorial agreement to commit murder." ***Id.*** at 24.

The trial court found that Thomas's rights under ***Bruton*** were not implicated. It explained:

> [T]he Commonwealth was not trying Lemar as a co-defendant. The Supreme Court's jurisprudence under ***Bruton*** precludes a "non-testifying codefendant's confession" from being admitted at trial. This was not the case here. The evidence recovered from Lemar's phone included text conversations and images, but no confession. Moreover, . . . the Commonwealth elected to not pursue Lemar as a co-defendant in [Thomas's] case. As such, [Thomas's] rights under ***Bruton*** were not even implicated, let alone violated.

Trial Ct. Op. at 47-48.

We draw the same conclusion as the trial court. Here, unlike in ***Bruton***, the statements were not a confession by a co-defendant at a joint trial. Rather, they were text messages between Thomas and an unindicted co-conspirator.

Further, Thomas could have subpoenaed Lemar to testify as a witness at his trial. Accordingly, this claim is without merit.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 12/23/2024