J-S07031-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| ROBERT L. ROHRBACH | : | |
| | : | |
| Appellant | : | No. 1500 MDA 2018 |

Appeal from the Judgment of Sentence Entered May 8, 2018
In the Court of Common Pleas of Berks County Criminal Division at
No(s):  CP-06-CR-0004178-2016

BEFORE:   OLSON, J., McLAUGHLIN, J., and PELLEGRINI*, J.

MEMORANDUM BY PELLEGRINI, J.:          **FILED: MARCH 27, 2019**

Robert L. Rohrbach (Rohrbach) appeals from the judgment of sentence of 16 to 40 years' incarceration imposed following his conviction for third-degree homicide.  On appeal, Rohrbach raises issues as to evidentiary rulings and the weight of the evidence.  We affirm.

The trial court's Pa.R.A.P. 1925(a) opinion summarized the basic facts as follows:

> On the evening of December 18, 2015, the Defendant, Robert Rohrbach, was at home with his girlfriend and victim, Deni[e]se McAvoy.  At some point that evening, they went upstairs to the bedroom and an argument ensued, which was heard by the next door neighbor. Ms. McAvoy lay down in the spare bedroom while the Defendant went to bed in the master bedroom.
>
> In the afternoon of December 19, 2015, the Defendant contacted his estranged mother and asked her to come over to his house because something horrible had happened.  The mother came and he eventually told her that his girlfriend, Ms. McAvoy, was dead.  His mother called the police and told them that the Defendant told

_____

* Retired Senior Judge assigned to the Superior Court.

her he had killed Ms. McAvoy. When the first police officer arrived and encountered the Defendant for the first time, the Defendant said, "I did it. I have mental problems. I killed her." More officers arrived and they found Ms. McAvoy's body in bed in the spare bedroom. The officers also found two handwritten notes from the Defendant. One said: "Call Police. Suicide. Downstairs bathroom. Upstairs middle bedroom." The other had a short explanation of the Defendant and Ms. McAvoy's tumultuous relationship and a short will. At the end it stated, "God forgive me." The officers also found a makeshift noose in the downstairs bathroom.

An autopsy of Ms. McAvoy's body was performed by Dr. Supriya Kur[u]villa. She determined after her examination that the manner of death should be classified as a homicide.

Trial Court Opinion, 10/30/18, at 2-3.

There was no dispute that Rohrbach was the only other person present when Ms. McAvoy died. Because the underlying issue was the cause of her death, a more detailed factual review is needed to analyze these claims.

## I.

## A.

Supriya Kuruvilla, M.D., performed the autopsy and opined that the manner of death was homicide. Dr. Kuruvilla testified that Ms. McAvoy died from "complications arising from blunt force injury to the abdomen." N.T. Vol. I, 4/5-12/18, at 206. The initial blow or blows were "to the abdominal wall which resulted in laceration of the pancreas," *id*., which in turn caused a hemorrhage. Those injuries led to the colon leaking fecal matter into the abdominal area, causing a fatal infection. *Id*. at 212. Dr. Kuruvilla stated that the injury would not result in immediate death and estimated that the inflammation and complications occurred over a period ranging from "several

hours to a couple of days." *Id*. As to the initial damage to the pancreas, she explained that "less than .2 percent of injuries" in blunt force trauma cases are to the pancreas, as the organ is well-protected since it sits towards the back of the body. *Id*. at 209. The doctor testified that the force required to cause injury to that organ is substantial and "usually requires a very focused and hard force in the middle of the abdomen which would then crush the pancreas against the spine and then produce injury." *Id*. Dr. Kuruvilla stated that a fall down the stairs[1] or other type of fall would not cause pancreatic lacerations "unless there's a fall onto an object that would explain that kind of impact." *Id*. at 211. Additionally, Ms. McAvoy exhibited several injuries to her face that were in various states of healing.

Samuel Land, M.D., a forensic pathologist, who the Commonwealth had retained to review Dr. Kuruvilla's findings, testified on behalf of Rohrbach. While he agreed that blunt force trauma caused injury to the pancreas and ruptured the colon, Dr. Land declined to rule the manner of death as a homicide or accidental. Instead, he concluded it was undetermined. Dr. Land stated that a fall down the stairs would be an atypical cause of such injuries,

---

[1] Rohrbach ultimately testified on his behalf. He and other defense witnesses stated that Ms. McAvoy was frequently intoxicated and often fell when she was drunk. He testified that Ms. McAvoy injured herself from a fall, complained of feeling ill, and went to bed. Rohrbach said he checked on her several times over the course of the next day and asked her to go to the hospital, which she refused. When he woke up on December 19, he found her dead. Rohrbach testified that he wrote the suicide note and did not immediately call the police because he wanted to join Ms. McAvoy in heaven.

"but had there been something on the steps, something heavy, let's take a barbell and this woman had fallen onto the barbell, that would be a possibility." *Id*. at 353. Dr. Land testified that he reviewed all the police reports, including the notes written by Rohrbach, which did not change his opinion.

**B.**

To strengthen the case that Ms. McAvoy's death was not an accident, much of the Commonwealth's evidence concerned the parties' relationship. Ms. McAvoy had been engaged to a man who developed cancer and died on May 15, 2014. Tara Shinn, Ms. McAvoy's work manager, testified that Ms. McAvoy and Rohrbach began dating about two weeks later. Shortly thereafter, Ms. McAvoy began coming to work smelling of alcohol and occasionally with bruises on her face. The two spoke in private and Ms. McAvoy indicated that Rohrbach was responsible for the injuries. Ms. McAvoy stopped coming to work as of July 11, 2014, and was officially terminated on August 12, 2014.[2]

Mrs. Shinn shared her concerns with Pamela Rodriguez, a fellow co-worker. Mrs. Rodriguez was friends with Ms. McAvoy and noticed that the abuse had escalated after Ms. McAvoy and Rohrbach moved in together, which she said happened sometime in the fall. On at least three occasions, Ms.

---

[2] Mrs. Shinn explained the reason for the one-month gap as, "I was hoping that, you know, she had that time to get herself together and that she would come back to work and continue doing the job that she did do prior to the passing of Tracy [her fiancé]." N.T. Vol. I, 4/5-12/18, at 320.

McAvoy showed Mrs. Rodriguez injuries and asked her to take photographs as proof. Mrs. Rodriguez took photos on November 7, November 20 and December 4, 2014. Ms. McAvoy told Mrs. Rodriguez to keep the evidence in case something happened to her.

On December 9, 2014, Ms. McAvoy called Mrs. Rodriguez crying and requesting Percocet that Mr. Rodriguez had due to a back injury. Mrs. Rodriguez left work and went to Ms. McAvoy's home and observed severe injuries. "The whole left side of her face and her shoulder were black, like not black and blue, but black. Like her face was so swollen she was unrecognizable." *Id*. at 292. Knowing that Ms. McAvoy had an outstanding warrant for unspecified alcohol charges, Mrs. Rodriguez reported her to the police to force Ms. McAvoy's removal from the home.

After Ms. McAvoy was released from jail, their socialization significantly decreased. However, on May 10, 2015, Ms. McAvoy showed up at the Rodriguez home nearly naked, bleeding and bruised. Mr. Rodriguez testified that he called his wife, who left work to come home. The two decided to call the police. The officer took no action as Ms. McAvoy did not want to pursue charges.

### C.

On appeal, with respect to evidence of prior abuse, Rohrbach challenges only the testimony of Mr. Rodriguez, Mrs. Rodriguez and Mrs. Shinn. However, the Commonwealth presented three additional witnesses, and in pre-trial litigation, Rohrbach asserted that all of this testimony must be excluded.

While Rohrbach has abandoned any challenge as to these other witnesses, those additional facts are relevant to the Commonwealth's theory of why the foregoing evidence was admissible. We briefly set forth those facts.

Wilson Serrano-Aponte lived next door to Ms. McAvoy and Rohrbach. Their homes shared a wall and on December 18, 2015, the day before Ms. McAvoy died, he heard "screaming between a man and a lady . . . [the] lady screaming like stop, stop, please stop." *Id*. at 13. The screams started at approximately 10:30 p.m. and went on for five to fifteen minutes. *Id*. at 15.

Another neighbor, Wendy Bobst, lived close to Rohrbach's house and would see Ms. McAvoy walking around the neighborhood. They would chat a couple times per week. Ms. Bobst noticed bruising and cuts on multiple occasions; on one of these, Ms. McAvoy's eyes were almost swollen shut and her face was bruised. Eventually, Ms. McAvoy asked Ms. Bobst to write down a list of names and numbers. Ms. Bobst did so and Ms. McAvoy instructed her to contact those persons if anything ever happened to her. Those names included Pamela Rodriguez and Tara Shinn.

Finally, Erinn Fortson, an employee of Laurel House, a domestic violence agency that provided shelter and counseling, testified that on November 23, 2015, Ms. McAvoy called to inquire about shelter. The two spoke and Ms. McAvoy stated she would call back but never did.

Rohrbach was convicted of third-degree homicide[3] and aggravated assault following a jury trial. His post-sentence motions were denied and he raises six issues on appeal.

**II.**

Rohrbach's first issue challenges the admission of the hand-written note recovered from his home. The note stated:

> I'm sorry for everything that happened. Deniese and I were alcoholics. We fought about it all the time. I couldn't leave or kick her out because I love her and she didn't have anywhere to go. She got drunk Thursday morning and I got upset. We argued and later I got drunk. She told me I flipped out and beat her. This has happened before. I am truly sorry to her family. I see no alternative but death for me. I would like all my assets, if any, to go to my daughter . . . .
>
> Cremate me / no service
>
> God forgive me

Commonwealth's Exhibit 12 (Reproduced at N.T. Vol. II, 4/5-12/18, at 658) (names omitted).

---

[3] The Commonwealth originally charged generic criminal homicide at count two of the information. While the opening and closing statements and jury instructions are not transcribed, both the transcript and the order recording the verdict state that the jury was not asked to consider count two. ***See*** Order, 4/12/18, at 2 ("Count 2 of the Information, Criminal Homicide, was not presented to the jury.").

Rohrbach challenges the admission of this note on hearsay grounds.[4] His argument has five subparts, only two of which are developed in any meaningful fashion.[5]

**A.**

First, Rohrbach argues that "the reason hearsay is generally inadmissible as evidence is that the competency and veracity of the person making the statement, **in this case Ms. McAvoy**, are not subject to examination and this lack of ability to examine the source of the statements renders the statements themselves untrustworthy and unreliable." Rohrbach's brief at 17-18. That statement of the law is accurate but irrelevant

_____

[4] "An appellate court's standard of review of a trial court's evidentiary rulings, including rulings on the admission of hearsay . . . is abuse of discretion." ***Commonwealth v. Walter***, 93 A.3d 442, 449 (Pa. 2014). Where the admissibility turns on a question of law, our standard of review is *de novo*. ***Id***.

[5] Specifically, his claim reads:

> The trial court erred in denying Appellant Rohrbach's motion in *limine* seeking to exclude the admission of the handwritten statements found in Appellant Rohrbach's residence where the notes themselves: (a) were hearsay without exception pursuant to the Pennsylvania Rules of Evidence 801; (b) were not admission of guilt to the crimes charged; (c) alluded to allegations of past physical altercations between Appellant Rohrbach and the victim that did not establish a nexus to the crimes charged; (d) lacked any indicia of reliability; and, (e) were taken out of context and carried a prejudicial effect that outweighed any possible probative value.

Rohrbach's brief at 6.

as applied to the note because Ms. McAvoy is not the declarant: Rohrbach is, as the writing is his own. The attempt to make Ms. McAvoy the declarant apparently relates to Rohrbach's reference, "She told me I flipped out and beat her." According to Rohrbach, the Commonwealth was introducing **that** out-of-court statement.

The trial court explained that it admitted the notes as a party admission. Trial Court Opinion, 10/30/18, at 4. This ruling was proper as it is well-settled that statements made by a defendant are an exception to the hearsay rule. "[A] defendant's out-of-court statements fall within the party admission exception to the hearsay rule." ***Commonwealth v. Laich***, 777 A.2d 1057, 1060 (Pa. 2001). The note reflects Rohrbach's own words and thought processes and was, therefore, admissible on that basis. ***See Commonwealth v. Barnes***, 871 A.2d 812, 818 (Pa. Super. 2005) (defendant's handwritten note admissible as party admission).

To the extent Rohrbach presented a challenge to the statements made by Ms. McAvoy, *i.e.*, that the writing contains hearsay within hearsay, we disagree that the statements of Ms. McAvoy constituted hearsay. The hearsay rule prohibits the admission of statements for their truth. The note had evidentiary significance regardless of whether it was actually true that Rohrbach beat Ms. McAvoy. The jury could draw significance from the mere fact that Rohrbach **believed** that the statement was true. In effect, he adopted the statements made by Ms. McAvoy. That behavior is probative of consciousness of guilt and was relevant to his mental state.

**B.**

Next, Rohrbach avers that even if the note falls within the hearsay exception, it is not automatically admissible. He contends that "[m]erely satisfying an exception to the hearsay exclusion is not enough to get past a constitutional challenge based upon the Confrontation Clause. Sufficient 'indicia of reliability' are also required." Rohrbach's brief at 18. Rohrbach avers that the note is unreliable because it is unclear from its face whether he actually remembered striking Ms. McAvoy.

The "indicia of reliability" language comes from ***Ohio v. Roberts***, 448 U.S. 56 (1980), which formerly governed the resolution of challenges to hearsay on Confrontation Clause grounds. "According to our description of that right in ***Roberts*** . . . [the Clause] does not bar admission of an unavailable witness's statement against a criminal defendant if the statement bears adequate indicia of reliability." ***Crawford v. Washington***, 541 U.S. 36, 40 (2004) (quotation marks and citation omitted). But in ***Crawford***, the United States Supreme Court abrogated ***Roberts***, noting that its test was simultaneously too broad and too narrow.

> ***Roberts*** conditions the admissibility of all hearsay evidence on whether it falls under a "firmly rooted hearsay exception" or bears "particularized guarantees of trustworthiness." 448 U.S., at 66, 100 S.Ct. 2531. This test departs from the historical principles identified above in two respects. First, it is too broad: It applies the same mode of analysis whether or not the hearsay consists of *ex parte* testimony. This often results in close constitutional scrutiny in cases that are far removed from the core concerns of the Clause. At the same time, however, the test is too narrow: It admits statements that *do* consist of *ex parte* testimony upon a

mere finding of reliability. This malleable standard often fails to protect against paradigmatic confrontation violations.

***Id***. at 60.

Here, Rohrbach cites cases predating ***Crawford***, which held that a Confrontation Clause issue arises when the Commonwealth seeks to introduce **testimonial** statements. Rohrbach sets forth no argument as to how the statement by Ms. McAvoy accusing him of beating her which he included in his note qualifies as testimonial.[6] We, therefore, reject his constitutional challenge.

## III.

Rohrbach's second claim concerns the testimony of Mr. and Mrs. Rodriguez and Mrs. Shinn, which the Commonwealth sought to introduce in its notice of intent to introduce evidence pursuant to Pa.R.E. 404(b)(2).[7]

---

[6] There is no precise definition of "testimonial statements," but the essence is that the declarant is acting as a "witness" providing the equivalent of sworn testimony. "It is the testimonial character of the statement that separates it from other hearsay that, while subject to traditional limitations upon hearsay evidence, is not subject to the Confrontation Clause." ***Davis v. Washington***, 547 U.S. 813, 821 (2006).

[7] Rule 404(b) prohibits the use of other acts evidence to show that a person acted in conformity with those acts. Rule 404(b)(2), which is non-exhaustive, permits the introduction of that evidence for purposes of proving "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." The evidence is admissible "only if the probative value of the evidence outweighs its potential for unfair prejudice." When reviewing the decision to admit such evidence, our standard of review is as follows:

Rohrbach filed a motion in response and the trial court held an extensive hearing on the matter, followed by post-hearing briefs from both parties. Rohrbach's argument has three subparts.[8]

**A.**

Rohrbach first asserts that the prior acts were insufficiently similar to the acts that resulted in Ms. McAvoy's death. We agree but the introduction

---

[q]uestions regarding the admission of evidence are left to the sound discretion of the trial court, and we, as an appellate court, will not disturb the trial court's rulings regarding the admissibility of evidence absent an abuse of that discretion. An abuse of discretion is not merely an error of judgment; rather, discretion is abused when the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias, or ill-will, as shown by the evidence or the record . . . .

***Commonwealth v. Windslowe***, 158 A.3d 698, 712–13 (Pa. Super. 2017) (citation omitted).

[8] The full text of his challenge states:

The trial court erred in denying Appellant Rohrbach's motion in *limine* seeking to exclude the testimony of Tara Shinn, Pamela Rodriguez, and Miguel Rodriguez which was offered to establish an alleged history to domestic abuse of the victim at the hands of Appellant Rohrbach where such testimony: (a) was not so similar to the incidents described by the Criminal Complaint filed in this matter as to overcome the requirements of Pennsylvania Rules of Evidence Rule 404(b); (b) only served to cast Appellant Rohrbach in a bad light and prejudice the fact-finder such that its prejudicial effect outweighed it probative value; and, (c) concerned prior alleged assaults were all too remote in time and did not bear any resemblance to the charged crime.

Rohrbach's brief at 6.

of this evidence did not rely on that theory. Our Supreme Court recently summarized the principles when dealing with "similar acts" evidence in *Commonwealth v. Hicks*, 156 A.3d 1114 (Pa. 2017) (OAJC):

> This Court has long recognized an exception to the general inadmissibility of other crimes evidence where there is a striking similarity—or logical connection—between the proffered prior bad acts and the underlying charged crime. As early as 1872, in *Shaffner v. Commonwealth*, 72 Pa. 60 (1872), the Court described the importance of such a connection as follows:
>
> > It is a general rule that a distinct crime, unconnected with that laid in the indictment, cannot be given in evidence against a prisoner. It is not proper to raise a presumption of guilt, on the ground, that having committed one crime, the depravity it exhibits makes it likely he would commit another. ... To make one criminal act evidence of another, a connection between them must have existed in the mind of the actor, linking them together for some purpose he intended to accomplish; or it must be necessary to identify the person of the actor, by a connection which shows that he who committed the one must have done the other.
>
> *Id*. at 65.
>
> In further explaining the logical connection standard, this Court has noted " 'much more is demanded than the mere repeated commission of crimes of the same class, such as repeated burglaries or thefts. The device used must be so unusual or distinctive as to be like a signature.' "

*Id*. at 1125–26 (some citations omitted).

Rohrbach is correct that the history of prior abuse is not similar to the acts resulting in the victim's death and would fail the foregoing test. But in *Hicks*, the prior acts evidence concerned the defendant's attacks on **other**

women.  Here, the Commonwealth introduced evidence of the prior acts against the **same** person to establish (1) an escalation of violence as part of a sequence of events, and/or (2) the absence of mistake (*i.e.*, that the death was not accidental).  Thus, the "similarity" exception to Pa.R.E. 404(b) was not at issue.  Instead, the Commonwealth maintained that the evidence was admissible for the separate reason that it was part of the history between the parties.  Hence, Rohrbach's argument has no merit.

**B.**

Nor is there merit in Rohrbach's remaining two contentions that (1) the evidence was too remote in time and (2) its probative value did not outweigh its potential for unfair prejudice.  Rohrbach relies on ***Commonwealth v. Green***, 76 A.3d 575 (Pa. Super. 2013).  Green was convicted of murdering his girlfriend by a gunshot to the head.  The Commonwealth called a witness who testified that two to three months before the shooting, she and the victim were preparing to go out when Green entered, pointed a gun at the victim, and said "where the F are you going[?]" ***Id***. at 583 (quoting trial transcript).  The trial court justified admitting the evidence as relevant to the chain of events.  Rohrbach quotes our disagreement with that rationale:

> In the instant case, the *res gestae* exception is not applicable to admit evidence of the gun-pointing incident.  The delay in time between the incident and the shooting, which was *at least* two months, is by itself strongly suggestive that the exception does not apply.  Nevertheless, there is no specific timeframe that dictates the applicability of the exception.  However, it is also clear that the gun-pointing incident was in no way part of the same

- 14 -

transaction or sequence of events that constituted the crime for which Appellant was being tried.

*Id*. at 584 (emphasis in original).[9]

Rohrbach emphasizes that **Green** deemed a two-month delay between the prior act and the murder too remote while here, the challenged testimony discussed events occurring much more than two months before the victim's death. But as **Green** also observed, there is no specific timeframe that governs the *res gestae* exception and Rohrbach's invocation of a *per se* rule fails.

More importantly, the event analyzed in **Green** was a one-off incident that had little relation to the ultimate murder. In contrast, we have recognized the probative value of prior instances of abuse between a victim and assailant. In **Commonwealth v. Jackson**, 900 A.2d 936 (Pa. Super. 2006), Jackson and the victim had two children together and a long romantic relationship. During a fight, Jackson grabbed a cord and strangled the victim until she died. The Commonwealth introduced evidence that Jackson violated numerous Protection From Abuse (PFA) orders, plus testimony from several police officers that a pattern of abuse existed. Jackson, like Rohrbach, admitted to the police that he killed the victim and also claimed that it was an accident. Jackson argued that admission of this evidence was improper under Rule

_____

[9] **Green** held that the evidence was admissible as probative of motive and absence of mistake.

404(b). We held that the evidence was admissible under the *res gestae* exception and that its probative value outweighed its prejudicial effect:

> Specifically, Appellant contends that evidence relating to the parties' history of domestic abuse and prior PFA orders was improper since Appellant readily admitted he killed the victim and the only reason the Commonwealth offered the evidence was to prove Appellant's propensity for criminal behavior. We find no merit to this claim.
>
> > It is axiomatic that evidence of prior crimes is not admissible for the sole purpose of demonstrating a criminal defendant's propensity to commit crimes. This rule is not without exception, however. . . . . [**Commonwealth v. Melendez–Rodriguez**, 856 A.2d 1278, 1283 (Pa. Super. 2004)].
>
> Here, the evidence established that, since 1993, police officers responded to the parties' residence for numerous incidents where Appellant had beaten the victim, several times in violation of an existing PFA order. **The evidence suggests that the abuse by Appellant of the victim continued to escalate until Appellant ultimately murdered the victim**. The challenged evidence shows the chain or sequence of events which formed the history of the case, is part of the natural development of the case, and demonstrates Appellant's motive, malice, intent, and ill-will toward the victim. Therefore, the trial court did not err in permitting the evidence to be introduced at trial.

**Id**. at 940–41 (emphasis added).

Here, we likewise find no abuse of discretion for the reasons expressed in **Jackson**. The evidence in this case suggests a long pattern of abuse by Rohrbach. Significantly, the victim specifically asked Ms. Bobst to maintain a list of witnesses in case something happened to her. She also called a domestic violence agency to inquire about shelter. While Rohrbach apparently concedes that the trial court did not err in admitting that testimony, Ms. Bobst

was instructed to speak to Mrs. Rodriguez and Mrs. Shinn. All of these events are tied together to some degree and form a history of the case.

Finally, this pattern of abusive behavior was highly relevant to undercut the argument that the injuries leading to death were accidental. We find no abuse of discretion in admitting the evidence.

## IV.

Rohrbach's third, fourth and fifth claims all raise challenges to the weight of the evidence, with one challenge each as to Mr. Rodriguez, Mrs. Rodriguez and Mrs. Shinn. Rohrbach addresses all three together as do we.[10]

Rohrbach's weight arguments as to these three witnesses relitigates his Pa.R.E. 404(b) claim. Rohrbach's brief at 25-31 (discussing Pa.R.E. 404 with

---

[10] In **Commonwealth v. Roberts**, 133 A.3d 759 (Pa. Super. 2016), we explained the applicable standard of review as follows:

> A motion for a new trial based on a claim that the verdict is against the weight of the evidence is addressed to the discretion of the trial court. A new trial should not be granted because of a mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion. Rather, the role of the trial judge is to determine that notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice.

> In order for an appellant to prevail on a challenge to the weight of the evidence, the evidence must be so tenuous, vague and uncertain that the verdict shocks the conscience of the court.

**Id**. at 769-70 (citations and quotation marks omitted). Additionally, we only review the trial court's discretion in ruling on the claim, not the actual weight claim itself. **Commonwealth v. Clay**, 64 A.3d 1049, 1055 (Pa. 2013).

- 17 -

no reference to weight of the evidence). He fails to address how "certain facts [were] so clearly of greater weight than to ignore them or to give them equal weight" denies justice.

The one aspect that actually implicates the weight of the evidence relates to the May 10, 2015 incident where Mr. and Mrs. Rodriguez testified that they called the police after Ms. McAvoy arrived at their home bleeding and nearly naked. On cross-examination, counsel asked, "Would you be surprised to learn that in the report, Officer Lower indicates there were no visible marks on Deniese McAvoy that day?" N.T. Vol. I, 4/5-12/18, at 300. Both witnesses said yes. Rohrbach suggests this "testimony" deserves greater weight, presumably because a police officer would not fail to document the injuries.

However, Rohrbach fails to develop how the testimony of this one incident undercuts all the other instances of abuse, especially when actual photographs depicting said abuse were introduced. Furthermore, the claim that "Officer Lower reported seeing no bruises on Ms. McAvoy" is not accurate, as Officer Lower did not testify. There may or may not be reasons that the police report failed to describe any abuse that only the officer could explain. But in any event, the jury was entitled to resolve actual conflicts in the testimony. Surely it can be entrusted to resolve theoretical ones. No relief is due.

**V.**

The final claim attacks the weight of the evidence with respect to Dr. Kuruvilla's expert testimony regarding the manner of death. We find no abuse of discretion. The trial court cogently disposed of this issue in its opinion as follows:

Lastly, the Defendant argues that Dr. Kur[u]villa's testimony was against the weight of the evidence because she testified that any number of means could have caused the death of Ms. McAvoy. He further argues that this renders her testimony uncertain and that the verdict issued in reliance of her testimony was not valid.

In her testimony at trial, Dr. Kur[u]villa was forthright and firm in her conclusion that Ms. McAvoy died as a result of acute peritonitis due to transverse colon perforation and pancreatic laceration due to blunt force trauma of the abdomen. She determined that the manner of death was a homicide. She stated that the most common way to acquire that kind of injury was through an impact applied with great force. Some examples she gave of the type of force included a car accident, a punch, or a kick. Although a car accident was an example of how one might incur injuries such as those suffered by Ms. McAvoy, there was no evidence introduced that established that Ms. McAvoy had been in a car accident. Dr. Kur[u]villa also listed several other injuries that Ms. McAvoy had at the time of her death. These included lacerations on her face, bruises on her head, an injury to her neck indicative of manual strangulation, and fractured ribs. Because of the types of injuries that Ms. McAvoy suffered, Dr. Kur[u]villa was able to rule out possible scenarios for receiving the injuries such as a fall down the stairs or an accidental fall into an object. She also determined that the injuries could not have occurred from alcoholism, peritonitis, or a fecaloma. Dr. Kur[u]villa was confident that her ultimate determination of a homicide was correct, saying at trial:

> DR KUR[U]VILLA: My contention in calling it a homicide was that there was no alternate explanation that was offered to me to explain how this lady developed the pancreatic laceration and the transverse colon perforation or if she had, for example, been in a car crash very recently or if she

- 19 -

had reported very heavy object falling on her or if she had - or there was a report of her falling onto, say, a large blunt object to produce that kind of impact, then I would have called it an accident or if - even if there was any plausible doubt about some incident that raised doubt in my head, I might have called it undetermined. But in this case, none of those explanations were forthcoming.

Although Dr. Kur[u]villa could not say with certainty what moment the injuries occurred or what the actual force was, she was certain that the injuries that resulted in Ms. McAvoy's death must have been caused by the actions of another. Dr. Kur[u]villa's testimony was consistent with the conclusion that the Defendant caused the death of Ms. McAvoy and is not against the weight of the evidence.

Trial Court Opinion, 10/30/18, at 10-11.

We fully agree with this analysis and add only that Rohrbach's brief claims that the Commonwealth failed to rule out an accident as the explanation for the injury and death:

In the instant case, Mr. Rohrbach contends that in light of the trial testimony that Ms. McAvoy was prone to self-injury while drunk, that Dr. Kuruvilla's testimony regarding the cause of Ms. McAvoy's injury was weak and uncertain, and that Dr. Land's testimony established that Ms. McAvoy's injuries most certainly could have been received from a fall down a flight of stairs, the jury could not have concluded beyond a reasonable doubt that any action on his part caused the fatal injury. The verdict raises the question; upon what proof does the jury's conclusion rest? What evidence demonstrates beyond a reasonable doubt either of the competing propositions; the one suggesting that Ms. McAvoy's injuries were caused by Mr. Rohrbach or the one suggesting that Ms. McAvoy was, yet again, falling down drunk and injured herself? The answer, of course, is neither.

Rohrbach's brief at 36.

By questioning the validity of the verdict, Rohrbach is challenging the sufficiency of the evidence. Such arguments are improper in the weight

- 20 -

context. ***See Commonwealth v. Moreno,*** 14 A.3d 133, 136 (Pa. Super. 2011) ("A motion for new trial on grounds that the verdict is contrary to the weight of the evidence concedes that there is sufficient evidence to sustain the verdict but contends, nevertheless, that the verdict is against the weight of the evidence.") (quotation marks and citation omitted). The only real weight argument is that Dr. Land disagreed with Dr. Kuruvilla's conclusions. Obviously, it cannot be that the existence of competing expert opinions precludes a verdict. This challenge fails.

Judgment of sentence affirmed.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 03/27/2019