J-S26042-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| VICTOR RODRIGUEZ-GONZALEZ | : | |
| | : | |
| Appellant | : | No. 2130 EDA 2022 |

Appeal from the Judgment of Sentence Entered June 23, 2022
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0001953-2018

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| VICTOR RODRIGUEZ-GONZALEZ | : | |
| | : | |
| Appellant | : | No. 2131 EDA 2022 |

Appeal from the Judgment of Sentence Entered June 23, 2022
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0001954-2018

BEFORE: STABILE, J., KUNSELMAN, J., and McLAUGHLIN, J.

MEMORANDUM BY McLAUGHLIN, J.: **FILED NOVEMBER 3, 2023**

Victor Rodriguez-Gonzalez appeals from the judgments of sentence at

two trial court dockets for his convictions for numerous crimes: attempted

murder, aggravated assault, possession of a firearm prohibited, conspiracy,

firearms not to be carried without a license, carrying a firearm in public in

Philadelphia, and possession of an instrument of crime;[1] and recklessly endangering another person ("REAP") and conspiracy – REAP.[2, 3] Rodriguez-Gonzalez challenges the sufficiency and weight of the evidence and the admission of testimony. He also alleges prosecutorial misconduct. We affirm.

Rodriguez-Gonzalez was arrested and charged in 2018 following a shooting outside two bars. At his jury trial, the Commonwealth presented the testimony of several people present at the scene. It first called one of the victims, Wilman Gonzalez, to testify. He stated that on March 12, 2014, at a little before 3:00 a.m., he was in Marmeliz Bar with friends. N.T., Nov. 20, 2019, at 52. He heard "two shots and then somebody came to the bar knocking on the door and broke the glass." *Id.* at 53. He testified the security person exited the bar, and he and others followed. *Id.* at 54. He said that when he walked outside, he was shot in the left shoulder and the bullet came out his right side. *Id*. at 55-56. He stated that police officers put him in a patrol car and took him to the hospital. *Id.* at 57. He further testified that another person was shot in the foot. *Id.* Gonzalez testified that he was at Temple for a month and ten days and that he will never be able to walk again. *Id.* at 58. Gonzalez testified that he did not see who shot him. *Id.* at 63.

---

[1] Docket CP-51-CR-0001952.

[2] Docket CP-51-CR-0001954-2018.

[3] 18 Pa.C.S.A. §§ 901(a), 2702(a)(1), 6105(a)(1), 903, 6106(a)(1), 6108, 907, 2705, and 903, respectively.

Gorav Vij testified next. He stated that on the night of the shooting he was at Tamborita Bar with his friends Samuel (also known as Rubio), Manny, and Bud. *Id.* at 72, 74. While there, Samuel introduced Vij to Rodriguez-Gonzalez, who went by Prieto. *Id.* at 76-77. Vij testified that he sat next to Rodriguez-Gonzalez for two hours, Rodriguez-Gonzalez was wearing jeans and a short-sleeve shirt with a sign on it, and had tattoos on both of his arms and the back of his neck, and a mole on his face. *Id.* at 79-80.

Vij testified that Tamborita Bar closed at 2:00 a.m., but they were allowed to stay until 3:00 a.m. *Id.* at 81. When the group – including Rodriguez-Gonzalez - left, they went across the street to Marmeliz Bar. *Id.* at 84. Its door was locked, and Samuel punched and kicked the door, and it cracked. *Id.* at 85. The people in the Marmeliz Bar came out and the two groups started fighting. *Id.* at 86. Vij testified that Rodriguez-Gonzalez said that he was going to get his gun. *Id.* at 87.

Vij said that when he saw Rodriguez-Gonzalez come back, Vij yelled, "Come over here, come over here. Rubio [*i.e.*, Samuel] is getting beat up." *Id.* 89. Vij stated he yelled that because Rodriguez-Gonzalez had a gun in his hand. *Id.* Vij and Rodriguez-Gonzalez met, and Vij said, "Rubio is getting fucked up." *Id.* at 91. Vij testified that Rodriguez-Gonzalez said, "Fuck them," raised his arm, and shot at the Marmeliz Bar. *Id.* at 91-92.

Vij testified that he then saw the individual who had beat up Samuel (Rubio) run down D Street, and he asked Rodriguez-Gonzalez for the gun. *Id.* at 97. Vij stated he took the gun and shot twice down D Street. *Id.* at 98. Vij

then returned the gun to Rodriguez-Gonzalez, who put it "back behind his belt." *Id.* at 100. Vij stated that he, Rodriguez-Gonzalez, Samuel, and Manny met later at Samuel's house. *Id.* He testified that Rodriguez-Gonzalez stated that he was going to destroy the gun. *Id.* Vij testified that he did not see anyone else with a weapon during the fight. *Id.* at 101. The Commonwealth showed video surveillance, and Vij identified individuals in the video, including himself and Rodriguez-Gonzalez. *Id.* at 102. Vij testified that the video showed the gunshots, and that Rodriguez-Gonzalez "shot twice." *Id.* at 122.

Vij testified that he cooperated with the Commonwealth and testified at a grand jury investigation. *Id.* at 136-37. He said that he had entered an open guilty plea, and that the Commonwealth had not made any promises about a sentence. *Id.* at 157.

On cross-examination, Vij admitted that he had not told the grand jury that the group met at Samuel's house after the shooting, and had not included that fact in his statement to the police. *Id.* at 180-82. He also conceded that after the police released a video of the shooting, he shaved his goatee to change his appearance. *Id.* at 193-94. He further conceded that he was arrested in 2019 for driving under the influence of alcohol. *Id.* at 207. He stated that the charge was dismissed because he was not drunk and that the Commonwealth did not cancel his agreement due to the arrest. *Id.* at 207-08. Vij also agreed that although he was arrested in the instant incident in 2014, he did not speak with police until 2017. *Id.* at 199-201. He admitted

that he had pleaded guilty to lesser charges for the subject incident than those with which he initially was charged. *Id.* at 204.

On re-direct, the following exchange occurred regarding Rodriguez-Gonzalez's arrest:

BY [THE ASSISTANT DISTRICT ATTORNEY ("ADA")]:

Q Was Prieto ever arrested before you provided his name to the Commonwealth?

A Yes.

Q Was he?

A Yes.

[DEFENSE COUNSEL]: Objection. Asked and answered.

BY [THE ADA]:

Q He was arrested beforehand?

A Yes.

THE COURT: Overruled.

THE WITNESS: Oh, no. He was not.

BY [THE ADA]:

Q Before you provided his name, had you heard he had been arrested?

A No.

Q Okay. Do you remember when it was that you were told that he had been arrested based on what you had told us?

A Yeah, they said he got arrested for a DUI before that and then --

Q I'm talking about --

>           [DEFENSE COUNSEL]: I'm going to object and ask
>           for a mistrial.

*Id.* at 224-25. Following an off-the-record discussion, the trial court instructed the jury to disregard Vij's last statement, which it struck from the record. *Id.* at 225.

At the end of Vij's testimony, Rodriguez-Gonzalez's counsel again requested a mistrial based on Vij's statement that Rodriguez-Gonzalez had been arrested for a DUI. *Id.* at 233. The court denied the motion, noting that Rodriguez-Gonzalez had declined a curative instruction. *Id.* at 234.

The prosecution also presented the testimony of investigating police officers. Detective Larry Aitkin testified that he responded to the crime scene following the shooting. N.T., Nov. 21, 2019, at 5. He identified various photographs he took that evening, including photographs of the four .40 caliber fired cartridge casings ("FCC"). *Id.* at 12. He testified he recovered two FCCs on the sidewalk in front of D Street and two "a little bit further west on Wyoming Avenue." *Id.* at 14. On cross-examination, the following exchange occurred:

>           Q And FCCs, when you fire a semi-automatic weapon, it
>           kicks out usually about 12 to 24 inches, something like that,
>           from the weapon, correct?
>
>           A I would say it could vary.
>
>           Q Well, it goes up to, what, two feet; is this the generally-
>           accepted provision?
>
>           A I would say roughly. Yeah, I would say, yeah, probably
>           somewhere around there.

Q In other words, you're not going to fire a firearm over here and the FCCs are going to be across the two-lane street, correct?

A No, it's unlikely.

Q Right. Someone would have to be on this corner, in this particular area, generally, firing for the FCCs to be there; is that correct?

A That would be the assumption I would work on.

Q Very well. These are found inside of the street and they're .40 caliber, as well; is that right?

A That's right, sir.

[DEFENSE COUNSEL]: And when I say "these," I'm sorry, Your Honor, that would be the 2 Xs on the bottom of C-20 for purposes of this record.

THE COURT: Thank you.

BY [DEFENSE COUNSEL]:

Q Do you know the distance between where these two FCCs -- and they're .40 caliber, too, right?

A Yes, sir.

Q And I'm referring to the ones on the corner here. And the distance between those two would be?

A I don't have the exact distance, sir.

*Id.* at 29-31.

On re-direct, the ADA asked about the Detective's experience with shooting firearms. Detective Aitken replied he had fired a gun thousands of times, and, in his experience, with the gun in front of him, the "ejection pull would be on the right side of the gun" and the fired cartridge casing would go back two to three feet and to the right, so that the casing "would land behind a person's right shoulder if they're right-handed." *Id.* at 39.

The Commonwealth then asked him hypothetical questions. For example, it asked:

> Q Okay. And I want to show you 20-A. I want to ask you a couple questions about this. 20-A would be the chart.
>
> Detective, [defense counsel] was asking you some questions, and I'm going to ask you similar questions. If someone were facing down D Street and shot twice at D Street, there's a chance that those two fired cartridge would be exactly where you have them marked, correct?
>
> > [DEFENSE COUNSEL]: Objection.
>
> BY [ADA]:
>
> Q Well, if you're shooting in this direction, is it possible, hypothetically, since you said to the right and back three feet, that those -- someone would be shooting here down D Street, they would end up there?
>
> > [DEFENSE COUNSEL]: Objection to that hypothetical. He's not been qualified as an expert.
>
> > THE COURT: I'm going to sustain that.
>
> > . . .
>
> Q All right. Detective, how about these two? Would they follow the same trajectory that we're talking about? In fact, if someone fired those, would they follow the same physics, to the right and back?
>
> A That's the most likely scenario, correct.
>
> Q But when [defense counsel] pointed you here, did you need to find a fired cartridge casing to have the blood here or this victim here?
>
> A I think -- yeah, I understand where you're coming from. And I think the issue is where did the shooting happen and where was the victim when the shooting happened, so –
>
> Q But my question is this, you framed it perfectly.

Do you need, if, in fact, someone was shooting either here or from here, and we have video – you're not privy to the video, but if somebody were shooting and this man ended up getting shot in the back, would that person need to be standing here where the shell would only go there?[4]

. . .

Q Would you agree with me that the victim was in front of Marmeliz?

A Yes, sir.

Q Would you agree with me that you found no fired cartridge casings, as [Defense Counsel] asked you, in front of Marmeliz?

A That's right.

Q Does that mean that the shooter or the shooting could not have taken place from here?

[DEFENSE COUNSEL]: Objection.

. . .

[DEFENSE COUNSEL]: I would object to the speculative nature of the shooting could not have taken place here. That calls for speculation.

[ADA]: Judge, I don't think based on his experience --

THE COURT: All right. Brief sidebar, Counselors.

*Id.* at 42-46.

After the sidebar discussion, which was held off the record, the court permitted the Commonwealth to ask its questions:

Q Detective, hypothetically, okay, you said that you found the fired cartridge casing at what address here, the ones on Wyoming?

---

[4] At this time, defense counsel objected because it was a compound question, and the trial court sustained the objection.

A 444 East Wyoming in the street.

Q Okay. And this is 458, correct?

A That's correct.

Q Okay. The difference between that is how many properties; do you remember?

A Twelve.

Q Twelve properties.

If you are -- if the victim has fallen here and the victim is in front of 458, sir, again, you don't have video, you didn't see video, you have a fired cartridge casing here, if the person is standing anywhere here back and through three feet, could he have made that shot?

A Yes.

Q And if a person were standing here at the corner, and, again, you don't have video, and the person were shooting that way and, according to you, you say when you shoot your gun it goes back and three feet, would it be possible for you to have recovered these two fired cartridge casings from there if a person was shooting down that street?

A If a person was standing on or near the sidewalk at D and Wyoming, yes.

*Id.* at 46-48.

Another detective, Detective Thorsten Lucke, testified as an expert in the recovery and analysis of digital surveillance video. *Id.* at 81. He testified that there were surveillance videos from the bars, which were compiled together into one video to show a timeline of the night. *Id.* at 82-83. During his testimony, he drew the jurors' attention to certain individuals in the video or certain parts of the screen. *See, e.g., id.* at 90, 92, 93. Detective Lucke pointed out a flash of light in the video, which was being played in slow motion,

and he testified the flash was "consistent with the muzzle flash from a firearm." *Id.* at 96. Rodriguez-Gonzalez objected to Detective Lucke pointing anything out in the video, a side-bar conference was held mid-testimony, and he objected to the testimony regarding the muzzle flash. *Id.* at 89, 95, and 98.

A third detective, Detective James Perfidio, testified that he was assigned to investigate the shooting, and compiled a YouTube video from the surveillance footage to circulate on social media. *Id.* at 115. Based on the video, another police officer identified Vij. *Id.* at 115-16. He also testified regarding the remaining investigation.

Police Officer Raymond Andrejzcak, a ballistics expert, and Detective Samuel Gonzalez, who identified Vij from the YouTube video, also testified.

During defense counsel's closing argument, he referenced Vij's cooperation with the Commonwealth, arguing Vij's sentencing was postponed until after his testimony and he was "going to get a hell of a deal":

> You could read [Vij's] agreement [with the Commonwealth]. It's right here. It says, Gorav Vij waives any rights to a prompt sentencing – it's right here – and requests and agrees that the sentence be postponed until the District Attorney determines that his cooperation has been completed.
>
> Stop it. Don't fool us. Now you know. It's right here. Don't be fooled with his nonsense, we're busy. This is his duty. Self-preservation and freedom. We're going to postpone this sentencing until [Vij's] cooperation is done. Get [Rodriguez-Gonzalez] found guilty and [Vij is] going to get a hell of a deal.

N.T., 11/22/19, at 70-71.

- 11 -

During its closing, the Commonwealth responded to the attack on Vij's credibility:

> Let me tell you something about a little word called bias, B-I-A-S, because you're going to hear a lot about it. You're going to wonder and you've got to match the strength of a human being. And by the way, it's disgusting when someone says to you, you got to win this case because if we win this case – there's nothing in that language that says that. We would never do that. And you would read about it in the newspaper. I would never tell someone --
>
> [DEFENSE COUNSEL]: Objection.
>
> [ADA]: -- that the basis of winning or losing --
>
> [DEFENSE COUNSEL]: Objection.
>
> THE COURT: Your objection is noted.
>
> [ADA]: Thank you.
>
> So let's go on to the bias and what this man had to face, what the deal says. And what that says is you had better tell the truth. And if you tell something other than the truth -- first of all, you are going to go to jail for many years. And guess what? He's given the best confession ever. He's confessed over and over and over again. And that's what that young man sat with. When he was giving these answers, when he was doing just the simplest thing of saying, if you look at the Instagram, it's there. That would be him.

*Id.* at 95-97.

The jury found Rodriguez-Gonzalez guilty of attempted murder, aggravated assault-causing serious bodily injury, conspiracy, firearms not to be carried without a license, carrying firearms in public in Philadelphia, possessing an instrument of crime, REAP, and conspiracy.

- 12 -

In June 2022, the trial court imposed an aggregate sentence of 20 to 40 years' incarceration followed by seven years' probation. At sentencing Rodriguez-Gonzalez made an oral motion for extraordinary relief. In that motion, as well as in a post-sentence motion to compel, Rodriguez-Gonzalez challenged Vij's credibility and asked the court to order the Commonwealth to produce documents from Vij's criminal case. The documents he sought included the transcript of Vij's sentencing, Vij's judgment of sentence, and any sentencing memoranda filed in Vij's case. *See* Defendant's Motion to Compel, filed July 5, 2022; N.T., June 23, 2022, at 4-12. Rodriguez-Gonzalez also filed a post-sentence motion, wherein he requested a judgment of acquittal, sought a new trial for various alleged trial court errors, and requested modification of his sentence. The trial court denied the motion. Rodriguez-Gonzalez appealed.

He raises the following issues:

> A. Were the guilty verdicts against the weight of the evidence for attempted murder, aggravated assault, conspiracy to commit murder, REAP and the firearms charges, as the only evidence tying [Rodriguez-Gonzalez] to the shooting was the corrupt, polluted and self-interested testimony of cooperating codefendant Gorav Vij, who was seen on video possessing and shooting a firearm. Moreover, complainant Wilman Gonzalez never testified that [Rodriguez-Gonzalez] was the shooter. There was no evidence that [Rodriguez-Gonzalez] even possessed a firearm and none was recovered?
>
> B. Was the evidence insufficient to sustain the guilty verdict for attempted murder as the evidence did not establish that [Rodriguez-Gonzalez] had the specific intent to kill Wilman Gonzalez?
>
> C. Was the evidence insufficient to sustain the guilty verdict for conspiracy to commit murder, as there was no evidence

- 13 -

of any agreement between [Rodriguez-Gonzalez] and another person to murder Wilman Gonzalez?

D. Did the trial court err when it denied [Rodriguez-Gonzalez's] motion for a mistrial after the prosecution recklessly elicited testimony from cooperating codefendant Gorav Vij that [Rodriguez-Gonzalez] had an arrest record, as this was unfairly prejudicial to [Rodriguez-Gonzalez], and violated his due process right to a fair trial? (N.T., 11/20/19, p. 225)

Moreover, the prosecutor acted intentionally or with a conscious disregard that such prosecutorial overreaching would create a substantial risk that [Rodriguez-Gonzalez] would be deprived of a fair trial and violate [Rodriguez-Gonzalez's] substantive and procedural due process rights. Accordingly, the convictions should be reversed and the Commonwealth barred from retrying [Rodriguez-Gonzalez], pursuant to the Pennsylvania and United States Constitutions.

(*Commonwealth v. Johnson*, 231 A.3d 807, 826 (Pa. 2020); Pa. Const. art. I, § 10; U.S. Const. amend. V) (*Id.*)

E. During closing argument, did the trial court err in overruling [Rodriguez-Gonzalez's] objection to the prosecutor's improper personal vouching on behalf of its own case and witnesses' credibility, which was unfairly prejudicial? (N.T., 11/22/19, p. 96)

F. Did the trial court err in allowing Detective Larry Aitken to improperly answer various hypotheticals and provide expert-type testimony as to where the shooter could have been standing based on the location of FCCs? (N.T., 11/21/19, pp. 45-48)

G. Did the trial court err in allowing improper testimony from Commonwealth witness Detective Thorsten Lucke, who was qualified as an expert in the recovery and analysis of digital surveillance video. Detective Lucke's testimony exceeded the narrow scope of his expertise and was used to improperly instruct the jury as to what factual conclusions to draw and was done in a play-by-play fashion that was not only cumulative, but riddled with unfairly prejudicial commentary. Detective Lucke's testimony exceeded the scope of his expertise, commenting on people's

- 14 -

mannerisms, for instance, drawing the jury's attention to aspects he thought interesting but that had nothing to do with his expertise in recovery and analysis of digital surveillance video? (N.T., 11/21/19, pp. 83-110)

Rodriguez-Gonzalez's Br. at 9-10.

Rodriguez-Gonzalez first argues the verdicts were against the weight of the evidence, claiming the only evidence tying him to the shooting was the "self-interested and polluted source of the cooperating co-defendant . . . Vij." *Id.* at 25. He points out that only Vij was seen on video shooting a firearm and emphasizes that the victim did not identify the shooter. He notes that there were many men on the street at the time of the shooting and that Vij had been drinking prior to the fight. He argues that Vij lacked credibility, noting that he "received extremely favorable treatment from the Commonwealth," as the serious charges were reduced to misdemeanors and all charges as to Gonzalez were withdrawn and that he faced no consequences even though he was arrested for a DUI after signing the agreement. *Id.* He argues that Vij "ha[d] every reason to fabricate and implicate another, and provided testimony of such questionable credibility, that the verdicts were against the weight of the evidence as the verdicts were shocking to one's sense of justice." *Id.* at 26.

A challenge to the weight of the evidence must be presented to the trial court, usually in a post-sentence motion, to preserve it for appellate review. *See* Pa.R.Crim.P. 607 (providing "[a] claim that the verdict was against the weight of the evidence shall be raised with the trial judge in a motion for a new trial[.]"). "[T]he purpose of [Rule 607] is to make it clear that a challenge

to the weight of the evidence must be raised with the trial judge or it will be waived." **Commonwealth v. Gillard**, 850 A.2d 1273, 1277 (Pa.Super. 2004) (citation omitted). An appellant's failure to avail himself of any of the methods for presenting a weight of the evidence issue to the trial court constitutes waiver of that claim, even if the trial court responds to the claim in its Rule 1925(a) opinion. **Commonwealth v. Burkett**, 830 A.2d 1034, 1037 n.3 (Pa.Super. 2003).

Here, Rodriguez-Gonzalez did not present his weight claim to the trial court and therefore waived it. Although he challenged Vij's credibility in his motion for extraordinary relief and his motion to compel, he did not claim the verdict was against the weight of the evidence in those motions. Further, he did not raise a weight claim in his post-sentence motion. Because he did not challenge the weight of the evidence before the trial court, we cannot address it now. **See** Pa.R.Crim.P. 607; **Gillard**, 850 A.2d at 1277.

Rodriguez-Gonzalez's next two issues argue that the Commonwealth failed to present sufficient evidence to support the attempted murder and conspiracy convictions. He first argues there was insufficient evidence to support a finding that he had the specific intent to kill the victim. He claims the evidence at most established aggravated assault. In his view, it shows only that he shot twice at a group of people. He maintains there was no evidence the shots were "fired intentionally at any vital part of any person's body." Rodriguez-Gonzalez's Br. at 29. He maintains the victim was a bystander, not an intended victim. He acknowledges the law of transferred

intent, but argues the transferred intent applies to aggravated assault, not attempted murder. He claims there is no evidence he was trying to murder anyone.

He also claims there was insufficient evidence to support the conspiracy conviction. He argues there was no evidence he agreed with another to murder anyone. He argues that accepting the evidence as admitted, it shows that he acted alone, that is, that he "alone – retrieved his own firearm and then he – alone – discharged the firearm at the front door of the bar." *Id.* at 31.

When reviewing the sufficiency of the evidence, we must determine whether the evidence admitted at trial was sufficient "to enable the fact-finder to find every element of the crime beyond a reasonable doubt." ***Commonwealth v. Barnes***, 871 A.2d 812, 819 (Pa.Super. 2005) (citation omitted). "[O]ur scope of review is limited to considering the evidence of record, and all reasonable inferences arising therefrom, viewed in the light most favorable to the Commonwealth as the verdict winner." ***Commonwealth v. Rushing***, 99 A.3d 416, 420–21 (Pa. 2014). Our standard of review is *de novo*. *Id.* at 420.

Criminal attempt occurs when, with intent to commit a specific crime, a person commits any act that constitutes a substantial step toward the commission of that crime. 18 Pa.C.S.A. § 901(a). Under this standard, to establish attempted murder, the Commonwealth must prove beyond a reasonable doubt that the defendant took "a substantial step toward the commission of a killing, with the specific intent in mind to commit such an

act." ***Commonwealth v. Dale***, 836 A.2d 150, 153 (Pa.Super. 2003) (citation omitted). Specific intent to kill may be inferred from evidence that the defendant used a deadly weapon on a vital part of the victim's body. ***Id.***

The evidence here was sufficient to prove attempted murder. The testimony was that Rodriguez-Gonzalez left the fight and returned with a gun, said, "Fuck them," and fired it at the assailants. That was enough for the jury to find specific intent to kill.

The evidence was likewise sufficient to prove conspiracy. "To convict a defendant of conspiracy, the trier of fact must find that: (1) the defendant intended to commit or aid in the commission of the criminal act; (2) the defendant entered into an agreement with another (a 'co-conspirator') to engage in the crime; and (3) the defendant or one or more of the other co-conspirators committed an overt act in furtherance of the agreed upon crime." ***Barnes***, 871 A.2d at 819 (citation omitted). "The essence of a criminal conspiracy, which is what distinguishes this crime from accomplice liability, is the agreement made between the co-conspirators." ***Id.*** (citation omitted).

Direct evidence of the defendant's criminal intent or the conspiratorial agreement "is rarely available." ***Id.*** at 820 (citation omitted). The Commonwealth may prove the defendant's intent and the agreement "through circumstantial evidence, such as by the relations, conduct or circumstances of the parties or overt acts on the part of the co-conspirators." ***Id.*** (citation omitted). If the trier of fact finds an agreement existed, and that the defendant intentionally entered into it, the defendant "may be liable for the

- 18 -

overt acts committed in furtherance of the conspiracy regardless of which co-conspirator committed the act." *Id.* (citation omitted).

The court found sufficient evidence supported the conspiracy conviction:

> Here, the Commonwealth presented sufficient evidence of an agreement between [Rodriguez-Gonzalez] and Vij to murder Wilman Gonzalez. [Rodriguez-Gonzalez] and Vij had an agreement and understanding that [Rodriguez-Gonzalez] would fire his weapon at the group outside of the Marmeliz Bar. Vij testified that during the fight he heard [Rodriguez-Gonzalez] yell "I'm getting my gun." N.T. 11/20/19 at 87.
>
> [Rodriguez-Gonzalez] ran down the street and returned to the fight with his gun. *Id.* at 88. Knowing [Rodriguez-Gonzalez] had a gun, Vij signaled for [Rodriguez-Gonzalez] to "come over here" because "[Samuel] is getting beat up." *Id.* at 89. Both [Rodriguez-Gonzalez] and Vij returned to the fight, and [Rodriguez-Gonzalez] lifted his gun, pointed at the group, said "fuck them," and fired into the group. *Id.* at 91. These facts clearly establish that [Rodriguez-Gonzalez] and Vij both had a common plan for [Rodriguez-Gonzalez] to shoot at the group that had beaten [Samuel].

Trial Court Opinion ("1925(a) Op."), filed Dec. 20, 2022, at 14.

We agree that sufficient evidence supported the conspiracy conviction. Rodriguez-Gonzalez stated that he was going to get his gun. When he returned, Vij, who knew Rodriguez-Gonzalez had retrieved a gun, informed him that their friend was getting beaten up. Rodriguez-Gonzalez then fired at the group of people. The evidence of their concerted actions was sufficient to prove a tacit agreement.

In his next issue, Rodriguez-Gonzalez argues the trial court erred when it denied his motion for a mistrial after the ADA "repeatedly asked reckless questions about [Rodriguez-Gonzalez] being previously arrested." Rodriguez-

Gonzalez's Br. at 33. He argues the misconduct was unfairly prejudicial and violated his due process right to a fair trial. *Id.* He contends that "the vague and imprecise series of questions eventually elicited unfairly prejudicial information dealing with another arrest." *Id.* He therefore claims that because the ADA acted recklessly, that is, with a conscious disregard for a substantial risk that he would be deprived of a fair trial, the verdicts should be reversed and the Commonwealth barred from retrying him. *Id.* at 34. In support, he cites *Commonwealth v. Johnson*, 231 A.3d 807 (Pa. 2020) (concluding double jeopardy bars retrial where there is prosecutorial misconduct undertaken with a conscious disregard for a substantial risk that the defendant will be deprived of the right to a fair trial).

"Prosecutorial misconduct occurs where the 'unavoidable effect' of the prosecutor's actions is to 'prejudice the jury, forming in their minds fixed bias and hostility towards the accused so as to hinder an objective weighing of the evidence and impede the rendering of a true verdict.'" *Commonwealth v. Graham*, 109 A.3d 733, 736 (Pa.Super. 2015) (quoting *Commonwealth v. Chmiel*, 777 A.2d 459, 464 (Pa.Super. 2001)). When we review a claim of improper prosecutorial comments, we determine whether the court abused its discretion. *Commonwealth v. Noel*, 53 A.3d 848, 858 (Pa.Super. 2012). We focus "on whether the defendant was deprived of a fair trial, not a perfect one[.]" *Id.*

In *Graham*, the defendant was tried for sexual assault crimes against his daughter. 109 A.3d at 735. During the trial, the defendant's wife

volunteered during her testimony that her son was also a victim. *Id.* The following exchange occurred during the Commonwealth's questioning of the wife:

> Q. Why did he offer to call?
>
> A. To apologize. That's—
>
> Q. Did he say that?
>
> A. Yes, more or less tell them I'm sorry.
>
> Q. When you say them, who?
>
> A. My son was also involved.
>
> Q. That's not what we're here about today.
>
> A. No.

*Id.* at 737 (alteration in original) (citation omitted).

We concluded the exchange did not constitute prosecutorial misconduct. We pointed out the prosecutor did not "ask, directly or indirectly, about any unrelated criminal conduct," and the line of questioning pertained only to daughter. *Id.* at 737. We noted that although the "prosecutor could have worded his final question to Wife more carefully, the fact remains that he never prompted Wife to begin referring to more than one victim." *Id.* at 738. We concluded the exchange, "considered by itself," did not "evince[] prosecutorial misconduct, much less an intent to provoke a mistrial or deprive [the defendant] of a fair trial." *Id.*

Similarly, here, the prosecutor did not ask about unrelated criminal conduct. As Rodriguez-Gonzalez acknowledges, the prosecutor was attempting to elicit information about the arrest in the current case, not other

arrests. Rodriguez-Gonzalez's Br. at 33. We cannot find that the "unavoidable effect" of this brief exchange, formed in the jurors' minds a "fixed bias and hostility towards the accused so as to hinder an objective weighing of the evidence and impede the rendering of a true verdict." *Graham*, 109 A.3d at 736. The court therefore did not err in denying the motion for a new trial. Because we find the court did not err in denying the motion for a new trial, we need not determine whether any re-trial is barred by double jeopardy principles.

Rodriguez-Gonzalez next argues the trial court erred in overruling his objection to the ADA's improper personal vouching for its case and the witnesses. He argues the ADA personally vouched for all the witnesses, which had a prejudicial effect on the jury. He references the ADA's comments during closing regarding Vij's testimony. Rodriguez-Gonzalez's Br. at 36. He notes a question by the jury asking to see "two portions of the video in order to better see the individual identified by the ADA as the defendant." *Id.* at 36-37 (quoting N.T., Nov. 25, 2019, at 3). Rodriguez-Gonzalez claims the question shows the jury was deferring to what the ADA said the facts should be.

"[V]ouching is a form of prosecutorial misconduct, occurring when a prosecutor 'places the government's prestige behind a witness through personal assurances as to the witness's truthfulness, and when it suggests that information not before the jury supports the witness's testimony." *Commonwealth v. Lawrence*, 165 A.3d 34, 42 (Pa.Super. 2017) (quoting *Commonwealth v. Reid*, 99 A.3d 427, 447 (Pa. 2014)). "Improper bolstering

or vouching for a government witness occurs where the prosecutor assures the jury that the witness is credible, and such assurance is based on either the prosecutor's personal knowledge or other information not contained in the record." *Id.* at 42-43 (quoting *Commonwealth v. Chmiel*, 30 A.3d 1111, 1180 (Pa. 2011)).

Although "it is improper for a prosecutor to express a personal belief as to the credibility of the defendant or other witnesses," the prosecutor "may comment on the credibility of witnesses." *Id.* at 43 (quoting *Commonwealth v. Judy*, 978 A.2d 1015, 1020 (Pa.Super. 2009)). Moreover, "a prosecutor is allowed to respond to defense arguments with logical force and vigor" and "[i]f defense counsel has attacked the credibility of witnesses in closing, the prosecutor may present argument addressing the witnesses' credibility." *Id.* (quoting *Judy*, 978 A.2d at 1020).

Here, the trial court found the Commonwealth did not engage in improper bolstering or vouching. It found the ADA's comments were a response to defense counsel's closing argument, which focused on undermining Vij's credibility and highlighted his potential bias because of his cooperation. 1925(a) Op. at 19. The court found the Commonwealth's rebuttal was appropriate because "it was in fair response to points made in [Rodriguez-Gonzalez's] closing." *Id.* It further noted the Commonwealth's comments were based on Vij's agreement, which was in evidence.

We agree with the trial court and conclude the Commonwealth did not engage in improper bolstering or vouching. Rather, it responded to Rodriguez-

Gonzalez's arguments attacking Vij's credibility and in support, it relied on evidence admitted at trial. To the extent Rodriguez-Gonzalez claims the Commonwealth also bolstered the testimony of other witnesses, he does not specify where in the record such bolstering occurred, other than "right before" the quoted section. We do not see any comments that improperly vouched for witnesses prior to the comments regarding Vij.

Rodriguez-Gonzalez's final two issues challenge evidentiary rulings. This Court will reverse an evidentiary ruling only for an abuse of discretion. **Commonwealth v. Hernandez**, 230 A.3d 480, 489 (Pa.Super. 2020). An abuse of discretion is "not merely an error of judgment, but is rather the overriding or misapplication of the law, or the exercise of judgment that is manifestly unreasonable, or the result of bias, prejudice, ill-will or partiality, as shown by the evidence of record." **Commonwealth v. Antidormi**, 84 A.3d 736, 749 (Pa.Super. 2014) (quoting **Commonwealth v. Weakley**, 972 A.2d 1182, 1188-89 (Pa.Super. 2009)).

First, Rodriguez-Gonzalez argues the court erred in allowing Detective Aitken to give improper opinion testimony. He argues the ADA's hypothetical questions about the shooter's location elicited testimony that required scientific, technical, or specialized knowledge. Because Officer Aitken was not qualified as an expert, Rodriguez-Gonzalez maintains the testimony was improper.

Lay opinion testimony is governed by Pennsylvania Rule of Evidence 701, which provides that:

> If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is:
>
> (a) rationally based on the witness['] perception;
>
> (b) helpful to clearly understanding the witness['] testimony or to determining a fact in issue; and
>
> (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

Pa.R.Evid. 701.

The trial court concluded the testimony was permissible lay opinion:

> [B]ased on his perception of the crime scene and his twenty-nine years of experience as a police officer, Detective Aitken testified to two possible locations of the shooter based on the location of the four fired cartridge cases. The crime scene reflected two sets of fired cartridge cases: one set located in front of 458 East Wyoming Avenue and the other set located on D Street. N.T. 11/21/19 at 16. Detective Aitken formed his opinion based on his extensive experience with how guns function, noting that he shot a gun "thousands" of times, and further testified that in his experience with most guns, the fire cartridge casings project from the gun and land "two to three feet" behind the shooter's back. *Id.* at 39. Based on his perception of the crime scene, Detective Aitken provided testimony of possible locations of the shooter. This was permissible lay opinion testimony and did not require the specialized knowledge of an expert. Therefore, this court did not err in permitting Detective Aitken to answer the Commonwealth's hypotheticals about the shooter's location based off the location of the cartridge casings.

1925(a) Op. at 20.

The trial court did not abuse its discretion. The testimony was permissible lay opinion testimony, for the reasons outlined by the trial court. Further, we point out that Rodriguez-Gonzalez asked about the location of the

casings on cross-examination, and the Commonwealth's re-direct regarding the location of the casings was permissible in response.

Second, Rodriguez-Gonzalez argues that Detective Lucke's testimony regarding the video exceeded the scope of his expertise and was improper and unfairly prejudicial. He argues the testimony went beyond the technical aspects of the Detective Lucke's expertise when he testified in a play-by-play fashion that was cumulative and "direct[ed] the jury what factual conclusions to draw beyond the technical aspect of the surveillance videos." Rodriguez-Gonzalez's Br. at 41. Rodriguez-Gonzalez pointed out that the Detective "repeatedly told the jury to 'draw' their 'attention' to things such as people's mannerisms, what he believed was interesting, and what he believed to be a 'muzzle' flash, etc." which was outside the scope of his expertise and purpose for testifying. *Id.* He claimed that Detective Lucke "told the jury what they ought to believe they saw and implicitly what weight to give certain things, instead of proffering testimony regarding the recovery and analysis of surveillance video." *Id.* He argues the court abused its discretion in admitting the testimony over an objection. He argues the testimony was cumulative and outside the scope of the Detective's expertise and should have been suppressed.

In *Commonwealth v. Cole*, 135 A.3d 191 (Pa.Super. 2016), a police detective narrated video footage from security cameras that showed three individuals leave an apartment and walk out of view, the victim then

staggering and falling to the ground, and the same three individuals running away and fleeing in a vehicle. *Id.* at 192. The detective

> pointed out the time stamp at various points in the video; he described the location of the cameras to the scene, the physical relationships between people and buildings, and the movements of a vehicle; he identified three men leaving an apartment and running along the fence line and the victim staggering and falling down. Using measurements he and his colleague took, the video footage, and the time stamps, [the detective] calculated the direction, distance, and time covered by the three individuals.

*Id.* at 196 (internal citations to record omitted).

We concluded the trial court did not abuse its discretion in admitting the narration. We reasoned the testimony was based on the detective's experience, perceptions, and his personal knowledge of the scene, and the testimony was relevant to the jury's understanding of the timing, the actors, and the location of the events depicted. We further concluded that his testimony did not cause unfair prejudice or undue delay, confuse the issues, mislead the jury, or needlessly present cumulative evidence. *Id.*; *see also Commonwealth v. Brown*, 134 A.3d 1097, 1106 (Pa.Super. 2016) (finding court did not err in allowing detective to describe images in video and call attention to specific portions of video); *Commonwealth v. Palmer*, 192 A.3d 85, 101 (Pa.Super. 2018) (court did not abuse its discretion in admitting detective's identification of shooter from video, which was based on his perception of the video and placed his action in context, and noting the jury watched the video and was free to reach a different conclusion).

Like the testimony in **Cole**, Detective Lucke's testimony here was based on his experience, perception and knowledge of the scene, and the testimony was relevant to the jury's understanding of the actors and location of the events depicted. The court did not abuse its discretion in admitting the testimony.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 11/03/2023